In re **MUSKOGEE ENVIRONMENTAL CONSERVATION COMPANY, an Oklahoma Corporation, Muskogee Environmental Conservation Company, a Partnership, and William F. Scriminger, Debtors.**

**Bankruptcy Nos. 96–04292–M, 96–04293–M, 96–04522–M.**

United States Bankruptcy Court, N.D. Oklahoma.

July 14, 1999.

Sam G. Bratton II, Tulsa, OK, for plaintiff.

J. Philip Adamson, Tulsa, OK, Ron Wright, Muskogee, OK, for defendant.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL,
Bankruptcy Judge.

THIS MATTER comes before the Court pursuant to the Amended Motions to Dismiss Chapter 11 Case of MECCO Corporation, MECCO Partnership and William F. Scriminger (hereafter collectively the "Motion to Dismiss") filed by MKP Rocky Ltd. ("Rocky") and the First Maintenance and Support Trust, an Oklahoma trust (the "Trust"), creditors herein (hereinafter collectively "Creditors"), on February 9, 1998. *See Docket Nos. 226, 227, 228.* Creditors seek the dismissal of the Chapter 11 cases filed by Muskogee Environmental Conservation Company, an Oklahoma corporation, Muskogee Environmental Conservation Company, an Oklahoma partnership (hereinafter collectively referred to as "MECCO"), and William F. Scriminger, (hereinafter collectively referred to as "Debtors"). An evidentiary hearing was held on the Motion to Dismiss on April 23, 1999. Debtors appeared by and through their attorneys Sam G. Bratton, II and Richard Gable. Rocky appeared by and through its attorney, J. Philip Adamson ("Adamson"), and the Trust was represented by its attorney James E. Frasier.[1] The Court received evidence and heard argument from the parties. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52.

### Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b),[2] and venue is proper pursuant

---

1. James E. Frasier has since withdrawn as attorney for the Trust, and Ron Wright has entered his appearance on behalf of the Trust. *See Docket Nos. 409, 410, and 418.*

2. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (West 1999).

to 28 U.S.C. § 1409. Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a). This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A).

## Burden of Proof

 The burden to show cause for dismissal of a Chapter 11 bankruptcy rests on the movant by a preponderance of the evidence. *See, e.g., In re Nichols,* 223 B.R. 353, 355 (Bankr.N.D.Okla.1998) (citing *In the Matter of Woodbrook Assoc.,* 19 F.3d 312, 317 (7th Cir.1994)); *see also In re Vista Foods,* 1997 WL 837774 at 4, 226 B.R. 284 (Table Text) (10th Cir. BAP 1997) (unpublished disposition). Once a movant has made a *prima facie* showing of bad faith, the burden falls to the debtor to establish that the bankruptcy was filed in good faith. *See, e.g., In re Nichols,* 223 B.R. at 355 (citing *In the Matter of Namer,* 141 B.R. 603, 606 (Bankr.E.D.La.1992)).

## Findings of Fact

*History of the MECCO Entities*

William F. Scriminger ("W. Scriminger") and W.H. Ricketts ("Ricketts") co-founded MECCO in 1975. MECCO operates a very unique business involving the disposal of fly ash. Fly ash, a very fine dust, is a by-product of the burning of coal for the production of electricity. Because fly ash is highly particulate in nature, it may not be dispersed into the air through a smokestack. Its disposal is the subject of much environmental regulation.

In 1978, W. Scriminger developed and patented a process which prevents fly ash from polluting the air. The process involves the mixing of the fly ash with water (thereby keeping it out of the air) and disposal of the fly ash/water mixture in open pits or mines with the use of a "slurry gun." The "slurry gun" process eliminated many of the environmental hazards associated with the removal of fly ash and streamlined the disposal process. The patents used in the disposal process are owned by MECCO.

MECCO has used various sites, including a site in Oktaha, Oklahoma, (the "Oktaha Site") to dispose of and store the fly ash. In 1978, MECCO acquired a condemned underground limestone mine near Fort Gibson, Oklahoma (the "Fort Gibson site"). Currently, the Fort Gibson site is the main disposal site. The Fort Gibson site is owned by Barbara Scriminger. She is paid a monthly lease fee for allowing MECCO to dispose of the ash in the mine. The mine is essential to the successful operation of MECCO's business. MECCO has retained the Oktaha Site as a "back-up" disposal site.

*Business Structure of the MECCO Entities*

MECCO is a family owned business, consisting of two separate legal entities, Muskogee Environmental Conservation Company, a partnership, and Muskogee Environmental Conservation Company, an Oklahoma corporation. The partnership has its principal place of business in Muskogee County, Oklahoma. W. Scriminger and his wife Barbara J. Scriminger are its equal partners. The corporation also has its principal place of business in Muskogee County, Oklahoma. Its principal assets are held in Muskogee and Cherokee Counties, Oklahoma. The stock ownership of the MECCO corporation may be broken down as follows: (1) 50% of the stock is owned by W. Scriminger; (2) 25% of the stock is owned by Thomas G. Scriminger ("T. Scriminger"), son of W. Scriminger; and (3) 25% of the stock is owned by Elizabeth A. Scriminger Helmerson, daughter of W. Scriminger. T. Scriminger currently serves as the president of MECCO. W. Scriminger serves as Chairman of the Board and is consulted almost daily by his son regarding the operations of MECCO. MECCO maintains a workforce of between ten and twelve employees at any particular time, depending on its business needs.

*The OG & E Contract*

MECCO currently transports and processes fly ash from a single source, *i.e.,* the

Oklahoma Gas & Electric Plant in Muskogee, Oklahoma ("OG & E"). MECCO and OG & E entered into a contract for the disposal of the fly ash (the "OG & E Contract") commencing on March 1, 1977, and ending on December 31, 2006. The OG & E Contract is the cornerstone of MECCO's business. OG & E is MECCO's sole customer. The OG & E Contract is MECCO's sole source of revenue. Over the years the OG & E Contract has become extremely profitable for MECCO. OG & E has made previous attempts to renegotiate the OG & E Contract after becoming aware of the high profitability of MECCO's operations. MECCO has refused to renegotiate the OG & E Contract. However, the terms of the OG & E Contract are very stringent. Under the OG & E Contract, if MECCO fails to correct any problem in their service within ten (10) days, OG & E has the right to cancel the OG & E Contract. The officers of MECCO are certain that OG & E would cancel the OG & E Contract if MECCO failed to comply with any of its provisions to the letter.

*The Ricketts Litigation*

In the late 1980s, differences arose between MECCO's co-founders, W. Scriminger and Ricketts, regarding the ownership and management of MECCO. The relationship soured to the point that W. Scriminger and Ricketts entered into protracted and contentious litigation in the District Court in and for Tulsa County, State of Oklahoma (the "Ricketts Litigation").[3] W. Scriminger hired Adamson as his attorney to represent him against Ricketts. Initially, W. Scriminger and Adamson agreed that Adamson would be paid for his services on an hourly basis. During the course of the litigation, Ricketts named Adamson as a defendant in the action by asserting a cross-claim against Adamson. In the eyes of Adamson, a conflict of interest arose between Adamson and W. Scriminger as a result of the claims made against him. Adamson informed W. Scriminger that he could no longer represent him. Don Pearson ("Pearson"), an attorney in Muskogee, Oklahoma, was hired in October of 1993 to represent W. Scriminger. Under the initial terms of his retention, Pearson was paid a $25,000.00 non-refundable retainer. Pearson also billed W. Scriminger for his time on an hourly basis.[4] Pearson then informed W. Scriminger that it would be necessary to keep Adamson on the case because of Pearson's lack of experience in partnership and corporate law. Adamson continued to be paid for his services on an hourly basis.[5]

Less than two (2) weeks after Pearson had been hired and had been paid the $25,000.00 retainer, a new fee agreement was entered into between Adamson, Pearson and W. Scriminger. Under the new agreement, Adamson and Pearson agreed to represent W. Scriminger and MECCO

**3.** Much of the recounting of the State Court litigation is based on the Memorandum Opinion of the State Court of Civil Appeals, State of Oklahoma, Division 2 entitled *William F. Scriminger; Muskogee Environmental Conservation Company, an Oklahoma corporation; Muskogee Environmental Conservation Company, an Oklahoma partnership, Appellants vs. MKP Rocky Ltd., an Oklahoma Corporation; Mark A. Pearson, Trustee of the First Maintenance and Support Trust; Don Pearson; and J. Philip Adamson, Appellees*, No. 87,563, filed December 23, 1997 (the "Oklahoma Appellate Opinion"). Said decision was offered and received into evidence at a January 6, 1998, hearing on a disclosure statement filed by the Debtors. *See Docket Nos. 215M, Debtors' Exhibit 1*. The Court advised the parties that it would consider the same as a part of the record with respect to the Motion to Dismiss in an Order entered on December 6, 1998. *See Docket No. 353*.

**4.** The payment to Pearson on an hourly basis was in *addition to* the $25,000.00 retainer, which was apparently deemed to be earned upon receipt.

**5.** The arrangement is certainly a curious one. One is left to ponder both the selection of Pearson, given the statement that he lacked expertise in areas of law central to the dispute between W. Scriminger and Ricketts, as well as the continued representation of W. Scriminger by Adamson, given the conflict of interest which Adamson himself perceived.

in all of their disputes with Ricketts. The fee agreement underwent various mutations; however, in its final version Adamson and Pearson were assigned a percentage of the profits of MECCO until the year 2006. In particular the contract, titled "Contingent Fee Contract For Legal Services" (the "Fee Contract"), provided that seven percent (7%) of the Net Operating Profits (the "NOPs") of MECCO during the term of the OG & E Contract would be paid to Adamson and Pearson.[6] On January 29, 1994, the day the final version of the Fee Contract was signed, the litigation with Ricketts was settled. Under the terms of the settlement, W. Scriminger acquired one hundred percent (100%) of Ricketts' interest in MECCO,[7] and all litigation with Ricketts was terminated. According to the attorney for Ricketts, the settlement represented "a very favorable settlement for Ricketts against Scriminger and related entities." *See Oklahoma Appellate Opinion*, p. 12.

The interests in the Fee Contract have been assigned at various times. The Adamson Interest was first assigned to a trust for his minor child and then to Rocky. The Pearson Interest was assigned to Mark A. Pearson, Trustee of the Trust.

*Litigation with Rocky and the Trust*

Although W. Scriminger paid Adamson and Pearson (and their successors-in-interest) under the respective assignments for a period of time, he quickly became disenchanted with the Fee Contract. W. Scriminger's displeasure with the Fee Contract culminated in the filing of a Complaint in the District Court in and for Tulsa County Oklahoma (the "State Court") on May 18, 1994, alleging "duress, overreaching, undue influence and taking unfair advantage by a lawyer of his client."[8] W. Scriminger further claimed that the Fee Contract created a conflict of interest for both Adamson and Pearson, and that both Adamson and Pearson failed to adequately explain the Fee Contract to him. This litigation continued unabated for over two years.

On July 2, 1996, the State Court entered its judgment in favor of Rocky and the Trust. The State Court determined that the Fee Contract was valid and enforceable, and awarded Adamson and Pearson damages, costs, and attorneys' fees (the "State Court Judgment"). The State Court awarded the Trust and Rocky the sum of approximately $193,065.00 which was immediately executable against the Debtors. In addition, Adamson and Pearson were granted an ongoing judgment against W. Scriminger and MECCO in an amount equal to seven per cent (7%) of the monthly NOPs of MECCO.[9] Monthly judgments on NOPs were expected to continue until the year 2006, when the OG & E Contract expired according to its terms. MECCO was ordered to provide monthly accountings of its NOPs for the scrutiny of Rocky and the Trust. Under the terms of the State Court Judgment, Rocky and the Trust were given the power to question the amount of the NOPs and any expenditures incurred by MECCO, in effect being

---

6. Three-sevenths (3/7) of which would be paid to Adamson (the "Adamson Interest") and four-sevenths (4/7) of which would be paid to Pearson (the "Pearson Interest").

7. W. Scriminger obtained a loan of $2,750,-000.00 from BOK on March 17, 1993, to pay Ricketts for his interest in MECCO.

8. The parties have stipulated to the fact that the State Court proceeding involved exclusively state law. *See Pre–Trial Conference Order, Docket No. 370*, p. 2, ¶ g.

9. According to the calculations made a part of the record in this contested matter, the MECCO entities generated the following profits:

MECCO Partnership's NOPs:

| | |
|---|---|
| June 1, 1995 to December 31, 1995: | $551,868.23 |
| January 1, 1996 to May 31, 1996: | $485,957.95 |

MECCO Corporation's NOPs:

| | |
|---|---|
| June 1, 1995 to March 31, 1996: | $388,070.27 |
| April 1, 1996 to May 31, 1996: | $126,299.06 |

*See Debtors' Exhibit 13.*

able to force the MECCO entities before the State Court on a monthly basis.

After entry of the State Court Judgment, Rocky and the Trust began garnishment proceedings against the MECCO entities. Garnishment summons were issued by the State Court to BOK to garnish accounts of MECCO and Scriminger in the amount of $80,265.48 on September 17, 1996. *See Debtors' Exhibit 17.* An amended garnishment affidavit was filed in the State Court on September 20, 1996, reducing the amount sought from $80,-265.48 to $68,407.12. *See Debtors' Exhibit 19.* MECCO and Scriminger filed a motion to quash these garnishments and temporarily restrain enforcement of the State Court Judgment on September 19, 1996. *See Debtors' Exhibit 31.* BOK acknowledged the receipt of a Temporary Restraining Order regarding the garnishments on September 25, 1996. *See Debtors' Exhibit 21.* On October 10, 1996, an Order Regarding Garnishments was filed in the State Court recalling, vacating and withdrawing any order restraining or staying BOK with regard to any garnishments and ordering disbursement of funds to Rocky and the Trust. *See Debtors' Exhibit 34.* Subsequently, on October 26, 1996, the MECCO entities filed their respective petitions for Chapter 11 bankruptcy. On November 4, 1996, a garnishment summons was issued by the State Court to BOK against Scriminger in the amount of $155,376.19. *See Debtors' Exhibit 26.* Also on November 4, 1996, another garnishment summons was issued to BOK against Scriminger in the amount of $33,363.58. *See Debtors' Exhibit 28.* One day thereafter, Scriminger filed his petition for Chapter 11 bankruptcy.

*The Appeal of the State Court Judgment*

Debtors appealed the State Court Judgment. The appeal was pending when the respective bankruptcy cases were filed.

Debtors had the ability to bond the State Court Judgment, including that portion related to the future NOPs. In fact, the Debtors obtained a court-approved *supersedeas* bond before the bankruptcy filing but never filed it in the State Court. *See Pre–Trial Conference Order,* filed February 17, 1999, p. 2, ¶ k.[10] Debtors did not file a *supersedeas* bond pending the appeal, since the filing of the respective bankruptcy cases, with the imposition of the automatic stay provided for under § 362, eliminated the necessity for a *supersedeas* bond.

This Court granted relief from the automatic stay to proceed with the appeal on February 27, 1997. *See Docket No. 127.* The Civil Court of Appeals, State of Oklahoma, Division 2 reversed and remanded the State Court Judgment on December 23, 1997. On July 24, 1998, the Oklahoma Supreme Court denied a Motion for Rehearing. As a result, the State Court Judgment has been fully and finally vacated, and Debtors, Rocky and the Trust start out anew with respect to any litigation relating to the Fee Contract, whether such litigation takes place here or in the State Court.

*Effects of the State Court Judgment*

Even though it is not apparent that MECCO's ability to borrow from BOK was directly affected by the litigation with Adamson and Pearson, this is not to say that the State Court Judgment and its aftermath did not impose a strain on MECCO and its operations. MECCO's operating account at BOK was garnished. The Debtors considered the garnishments an embarrassment which put their long-standing relationship with BOK in jeopardy. The garnishments also depleted MECCO's operating accounts and increased its dependence on credit. Furthermore, Adamson and Pearson had the right to challenge the calculated amounts

---

10. The parties' stipulation is not entirely consistent with the evidence submitted to the Court. The evidence offered by the Debtors in opposition to the Motion to Dismiss contains several documents which purport to be *supersedeas* bonds, some of which bear the receipt stamp of the State Court. *See Debtors' Exhibits 42 through 49.*

of the NOPs and any expenditures made by MECCO, thereby, in effect, being able to force the Debtors before the State Court on a monthly basis.[11] In addition, much of T. Scriminger's time was consumed by litigation issues which left him with limited time to manage the actual operations of MECCO. As stated in the agreed to Pre–Trial Conference Order, one reason for the filing of the bankruptcy was to avoid the consequences of the State Court Judgment. *See Pre–Trial Conference Order, Docket No. 370, p. 2, ¶ i.*

*The Bankruptcy Cases*

The MECCO entities filed their respective Chapter 11 petitions in bankruptcy on October 21, 1996. W. Scriminger filed his personal Chapter 11 bankruptcy case on November 5, 1996. The bankruptcy cases are jointly administered.

The filing of the bankruptcy cases did nothing to abate the litigation between Debtors, Rocky and the Trust. The following adversary proceedings have been filed since these cases were commenced:

(1) Adversary Proceeding No. 96–0386–M, *Muskogee Environmental Conservation Company vs. MKP Rocky, Ltd. and Mark A. Pearson, Trustee of the First Maintenance and Support Trust* was filed on November 15, 1996, and stayed on February 27, 1997. In said adversary proceeding MECCO raises the issue of preferential transfers under § 547 from MECCO to Rocky in the amount of $40,053.76 and to the Trust in the amount of $61,291.02. Furthermore, MECCO also alleges that unless and until Rocky and the Trust pay the amounts alleged to be preferential transfers to the estate, any claims of Rocky and the Trust should be disallowed pursuant to § 502(d). Defendants in their Answer moved to dismiss the adversary proceeding because MECCO was purportedly solvent at the time of the alleged preferential transfers.

(2) Adversary Proceeding No. 97–0048–M, *Mark A. Pearson Trustee, the First Maintenance and Support Trust, and MKP Rocky, Ltd. vs. Muskogee Environmental Conservation Company, an Oklahoma Corporation, Muskogee Environmental Conservation Company, a Partnership, and William F. Scriminger* was filed on February 10, 1997, and stayed on February 27, 1997. The Complaint in the above-referenced adversary proceeding filed by Rocky and the Trust against MECCO makes claims for an order imposing a constructive trust with regard to the NOPs owed to Rocky and the Trust by MECCO. It further claims that consolidation of the above-referenced adversary proceeding with the contested matter regarding claim adjudication for NOPs is proper, and that the State Court Judgment should be given *res judicata* and collateral estoppel effect.

(3) Adversary Proceeding No. 97–0169–M, *Muskogee Environmental Conservation Company, Inc. vs. Don Pearson* was filed on May 6, 1997, and concluded on June 3, 1998. In the Complaint MECCO alleges that Pearson sent a letter to OG & E demanding that OG & E not interfere with the rights of Rocky and the Trust. Pearson allegedly threatened that negotiations between OG & E and the Debtors constituted actionable fraud and intentional interference with contractual rights by OG & E, exposing OG & E to substantial damage claims. Debtors alleged that Pearson's actions were in violation of the automatic stay and requested a preliminary injunction forbidding Pearson to communicate with OG & E in any way, a perma-

11. MECCO would also be responsible for any attorneys' fees incurred by Adamson and Pearson if their challenges were sustained by the State Court.

nent injunction to the same effect, actual damages, costs, attorney's fees and punitive damages.

In addition to these adversary proceedings, Debtors, Rocky and the Trust have litigated literally dozens of contested matters during the pendency of these bankruptcy cases. The litigation continues to this date.[12]

*MECCO's Financial Condition While in Chapter 11*

MECCO has remained a very successful and financially healthy business with yearly profits well in excess of $1,000,000.00. MECCO has accumulated over $1,400,-000.00 in cash during the pendency of the bankruptcy. Not only has MECCO been very profitable during the pendency of these cases, it has been rapidly reducing its outstanding debts.[13] MECCO has depended on its positive and long-standing relationship with BOK for the successful and secure operation of its business. Debtors have made substantial loan repayments to BOK both before and after the filing of these bankruptcy cases.[14] Aside from Rocky and the Trust, MECCO's only "real" creditor is BOK. The only other debts MECCO carries are incidental unsecured debts incurred in the normal operation of its business.

*The Plan*

On February 24, 1998, Debtors filed their Amended Joint Plan of Reorganization (the "Plan"). The Plan contained the following seven classes:

Class 1: Allowed administrative expense claims

Class 2: Priority claims

Class 3: Allowed secured claim of Bank of Oklahoma

Class 4: Claims of Rocky and the Trust

Class 5: Allowed unsecured claims

Class 6: Inter–Debtor claims

Class 7: Interests of Equity Holders in partnership and the corporation

The Plan provided for the following treatment of each of said classes:

Class 1: Payment in full within thirty days following confirmation.

Class 2: Payment in full within thirty days following confirmation.

Class 3: The claim of Bank of Oklahoma is to be "paid in full as agreed in the debt instruments associated with the BOK claims according to the terms of such debt instruments as modified by the Plan." The only modifications of the BOK claim were that:

 (a) the maturity date of one of the promissory notes was extended by one year from June 25, 2001 to June 25, 2002;

 (b) the first monthly payment amount under said note was reduced by $1,000.00, from $30,000.00 to $29,-000.00; and

 (c) the loan agreement would allow for the transfer of the capital stock of MECCO Incorporated between family members without the con-

---

**12.** The Court also stayed Rocky and the Trust from taking any action against Barbara J. Scriminger who is not a debtor in this case, and precluded her from transferring or expending any monies or property of the estate. *See Docket Nos. 58M & 63.*

**13.** MECCO has a limited history of borrowing money. On June 25, 1996, prior to the filing of bankruptcy, but after the entry of the State Court Judgment, Debtors obtained a $1.4 million loan from the Bank of Oklahoma ("BOK"). Said loan constituted a refinance of a previous loan made to the Debtors by

BOK. After the entry of the State Court Judgment and only five (5) days before filing bankruptcy, Debtors obtained a $873,000 loan/letter of credit from BOK. MECCO has never drawn upon said line of credit. It has functioned merely as an operational reserve.

**14.** The original loan with BOK was for approximately $2,750,000.00, which the Debtors paid down to about $1,400,000.00 prior to the filing of the bankruptcy. Since the filing of these bankruptcy cases, MECCO has reduced its debt to BOK by an additional $978,076.00.

sent of BOK, so long as BOK retains its lien on said property.

Class 4: The claims of Rocky and the Trust are to be paid either in full or over a period of time after their determination by this Court.

Class 5: Payment in full within thirty days following confirmation.

Class 6: All Class 6 claims are to be "reinstated, assumed and paid according to pre-petition terms of such claims."

Class 7: Holders of equity interests in the corporation and the partnership are to "retain all rights of ownership and benefits attendant to their respective interests."

Of the seven classes, Class 1, 2, 5, 6, and 7 are unimpaired. The impairment of Class 3 is nominal. The only major alteration in the treatment of a pre-petition claimant lies in the treatment of the claims of Rocky and the Trust.

*Sale of MECCO to Mineral Solutions, Inc.*

Debtors are currently in the process of selling their business to Mineral Solutions, Inc., a Delaware Corporation ("MSI"). On April 30, 1999, the Debtors filed a motion to allow them to sell MECCO to MSI.[15] On June 1, 1999, the Court entered an Order approving the Sale Motion.[16] The Sale Order approved an Asset Purchase Agreement. *See Docket No. 415, Exhibit A.* According to said agreement, MECCO will transfer to MSI all of its personal property, plant and equipment, all customer information, patents and technical data, and business records for a purchase price of $110,000.00. The Sale Order approved the assumption of the OG & E Contract by MECCO and its assignment to MSI for an initial cash payment of $609,000.00 as a royalty fee and commencing on January 15, 2000, and on each 15th day of each January thereafter through the year 2006, a royalty fee of $1,052,500.00 per year. It also approved the assignment of any easements or permits and granted an option to lease the Oktaha site to MSI. MSI was authorized by the Sale Order to acquire the Fort Gibson Mine and all rights associated therewith from Barbara Scriminger for a purchase price of $2,640,000.00. The Sale Order was not appealed and is now final.[17]

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

**Conclusions of Law**

Section § 1112(b) allows for the dismissal of a bankruptcy case for cause. It states in relevant part:

§ 1112. Conversion or dismissal

■ . . .

(b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, . . .

---

**15.** *See Combined Motion to Approve Sale of Property of the Estate of MECCO, Inc. Free and Clear of All Liens, Claims, Encumbrances, and Interests; to Authorize MECCO, Inc. to Lease Property Of the Estate, to Authorize MECCO Partnership to Grant an Option to Lease Property Of the Estate; and for Orders Protecting the Interests of MSI, Docket No. 399 (the "Sale Motion").*

**16.** *See Consolidated Order (i) Approving Sale of Property of the Estate of MECCO, Inc. (ii) Approving the Lease of Property of the Estate of MECCO, Inc., (iii) Approving the Assumption and Assignment of the OG & E Contract, (iv) Approving the Grant of an Option to Lease Property of the Estate of MECCO Partnership; (v) Ordering That the Interests Sold, Leased, Optioned, or Assigned by Debtors Be Free and Clear of All Liens, Claims, Encumbrances or Interests, Docket No. 415 (the "Sale Order").*

**17.** The Court does not know whether the sale to MSI has actually closed.

§ 1112(b). It has generally been established that dismissal for cause, though not specifically enumerated in § 1112(b), includes dismissal for bad faith. *See, e.g., In re Nichols,* 223 B.R. 353, 359 (Bankr. N.D.Okla.1998); *see, e.g., In re Laguna Associates Ltd. Partnership,* 30 F.3d 734 (6th Cir.1994) (hereafter *"Laguna"*); *see, e.g., In re Charfoos,* 979 F.2d 390 (6th Cir.1992); *see, e.g., In re Caldwell (Hardin v. Caldwell),* 851 F.2d 852 (6th Cir.1988); *see, e.g., In re Trident Assoc. Ltd. Partnership,* 52 F.3d 127, 130 (6th Cir.1995) (remarking that eight (8) circuits have held the same).

■ It has been recognized by many courts that the concept of "[g]ood faith is an amorphous notion" and must be defined by the court on a case-by-case basis based on specific factual inquiry. *See In re Okoreeh–Baah,* 836 F.2d 1030, 1033 (6th Cir. 1988); *see also Laguna,* 30 F.3d at 737. This Court has held that "[t]he determination of whether a bankruptcy case has been filed in good faith is a matter left to the sound discretion of the bankruptcy court." *In re Nichols,* 223 B.R. at 359. While no single factor is determinative, courts have enumerated some non-exclusive factors for evaluating good faith in the filing of a bankruptcy case:

(1) **the debtor has one asset;**

(2) the pre-petition conduct of the debtor has been improper;

(3) **there are only a few unsecured creditors;**

(4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;

(5) **the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;**

(6) **the filing of the petition effectively allows the debtor to evade court orders;**

(7) the debtor has no ongoing business or employees; and

(8) the lack of possibility of reorganization.

*Laguna,* 30 F.3d at 738 (citations omitted) (emphasis added). The *Laguna* analysis was adopted by the Tenth Circuit in *In re Nursery Land Dev., Inc.,* 91 F.3d 1414, 1416 (10th Cir.1996). *See also In re Nichols,* 223 B.R. at 359.

■ This Court finds that several of the factors enumerated in *Laguna* apply in this case. Although Debtors own more than one asset, this entire case (as well as the dispute between the Debtors and the Creditors) centers around a single asset, the OG & E Contract. Everything else which the Debtors own (save the personal property of W. Scriminger) is owned so that Debtors may fulfill their obligations under the OG & E Contract. The OG & E Contract is the only source of business revenue for these Debtors. Without the OG & E Contract, Debtors are out of business. In many ways, the present case is analogous to a single asset case.

In addition, the nucleus of these cases is a classic two-party dispute between the Debtors on the one side and Rocky and the Trust on the other side. The dispute is based exclusively on state law. The litigation in the State Court resulted in a judgment unfavorable to MECCO, as well as to the Scrimingers, and taxed their resources. None of the litigation issues currently before this Court could not be resolved by the State Court. Debtors and Creditors would be starting out on an even playing field in the State Court; the State Court Judgment which precipitated these bankruptcy cases has been vacated in its entirety. The mere fact that the Debtors fear that the litigation in State Court may be more protracted or contentious is not reason enough for this Court to step in the middle of what is essentially a two-party dispute based on non-bankruptcy law. *See, e.g., In re Mazzocone,* 183 B.R. 402, 414–415 (Bankr.E.D.Pa.1995). Debtors are not entitled to have the Bankruptcy

Court hear their complaints merely because they are disgruntled with the process in the State Court.[18]

Nothing could be more telling of the two-party nature of these bankruptcy cases than the Plan which Debtors have proposed. Under the terms of the Plan, the holders of equity interests in the partnership and the corporation retain those interests. Of the seven classes of creditors outlined in the Plan, only two classes are impaired. All others are paid in full within thirty (30) days of the date of confirmation of the Plan. The impairment with respect to the Class 3 Creditor, BOK, is nominal.[19] The Class 4 creditors are Rocky and the Trust. Under the terms of the Plan, Debtors intend to litigate the validity of the claims of Rocky and the Trust, and pay whatever amount is ultimately determined to be due and owing to them. The net effect of the Plan is to take the State Court Litigation and move it to this Court.

Even though MECCO had the ability to post a *supersedeas* bond for the State Court Judgment pending appeal, and in fact did post such bonds as to portions of the State Court Judgment (*see Debtors' Exhibits 42, 43, 44, 44A, 48 and 50* ), Debtors abandoned this course of action and sought relief from this Court. The filing of the bankruptcy petition and the imposition of the automatic stay obviated the necessity for the *supersedeas* bond.

Courts are split on the issue of whether the filing of a bankruptcy petition to avoid the posting of a *supersedeas* bond indicates bad faith. As one court has noted,

The issue of the use of bankruptcy relief in lieu of an appeal bond has been the subject of litigation and there are cases that favor each side of the issue. Some cases, such as *In re Karum*, 66 B.R. 436 (Bankr.W.D.Wash.1986), *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849, 851 (Bankr.S.D.N.Y.1984), and *In re Smith*, 58 B.R. 448 (Bankr. W.D.Ky.1986), were dismissed. In others, such as *In re Alton Telegraph Printing Co.*, 14 B.R. 238, 241 (Bankr. S.D.Ill.1981), *In re McLaury*, 25 B.R. 30 (Bankr.N.D.Tex.1982), and *In re Corey*, 46 B.R. 31 (Bankr.D.Hawai'i 1984) the dismissals were denied. *In re Holm*, 75 B.R. 86, 87 (Bankr.N.D.Cal.1987). The cases granting dismissal on bad faith grounds, with the exception of *Karum*, dealt with smaller judgments where the debtor had the ability to satisfy the judgment without losing the ability to stay in business. The cases denying the motion to dismiss typically involved larger judgments that would render the debtor unable to continue its business and allowed the judgment creditor only a partial recovery. *Id.*

*In re Boynton*, 184 B.R. 580, 582 (Bankr. S.D.Cal.1995), *cited with approval in In re Pomodoro Restaurant*, —— B.R. ——, 1999

---

**18.** There is supporting case law for the proposition that the threat of litigation and its consequences is sufficient for the good faith filing of a Chapter 11 bankruptcy case. *See, e.g., In re SGL Carbon Corp.*, 233 B.R. 285 (D.Del. 1999) (hereafter "*SGL* "). However, the facts in this case differ significantly from those found in *SGL*. The Court in *SGL* found that the litigation which the debtor faced was "potentially devastating." *SGL*, 233 B.R. at 290.

**19.** Given Debtors' history of accelerated reduction of the debt owed to BOK, the proposed modifications to the BOK claim are largely irrelevant. In order for a plan to be confirmed, § 1129(a)(10) requires that "at least one class of creditors that is impaired under the plan has accepted the plan." In this case, the following facts give rise to a strong inference that BOK was "impaired" for the sole purpose of complying with § 1129(a)(10): (1) only the claims of BOK and the Creditors are impaired; (2) the impairment of the BOK claim is minimal; and (3) Debtors have historically, both before and after the filing of these cases, pre-paid the debt to BOK. Creation of an impaired class of creditors for the sole purpose of obtaining plan confirmation is looked upon with disfavor by the courts. *See In re Dunes Hotel Assoc.*, 188 B.R. 174, 186–187 (Bkrtcy.D.S.C. 1995) ("The prohibition of artificial impairment of a class of claims in order to obtain technical compliance with § 1129(a)(10) has been overwhelmingly endorsed by the case law.") (citations omitted).

WL 282735 at *3 (10th Cir. BAP 1999) (unpublished disposition); *see also In re Fox*, 232 B.R. 229, 234 (Bankr.D.Kan.1999) ("This Court declines to adopt a *per se* rule that filing a bankruptcy as a substitute for posting an appeal bond always constitutes bad faith. The Court agrees with those cases that look to the circumstances of the case, including whether or not the debtor could afford to post such a bond. The focus of this inquiry should be on whether the debtor had the ability to post the bond without losing the ability to stay in business."). In the present case, MECCO has demonstrated the ability to operate at a profit in spite of the State Court Judgment and the bankruptcy filing. This Court finds that the Debtors had both the ability to post the necessary *supersedeas* bond and to satisfy the State Court Judgment without losing their ability to operate the business.

Debtors have few creditors. Aside from Rocky and the Trust, BOK is MECCO's main creditor. MECCO has been paying its debt to BOK on a rapidly accelerated basis. The MECCO entities are solvent, have demonstrated the ability to reduce their debt, and have earned a profit in excess of $1,400,000.00 while in bankruptcy. There is no evidence that any of the creditors of MECCO besides Rocky and the Trust were pressuring MECCO for payment of debts prior to the filing of this bankruptcy. It is indisputable that MECCO is a solvent debtor engaged in a two-party dispute involving non-bankruptcy law which could readily be resolved by the State Court. *See In re HBA East, Inc.*, 87 B.R. 248, 260 (Bankr.E.D.N.Y.1988) (citations omitted) ("Chapter 11 petitions filed for the purpose of frustrating the legitimate processes of a non-bankruptcy forum constitute use of the reorganization vehicle inconsistent with congressional intent."). MECCO filed this bankruptcy solely to gain protection from Rocky and the Trust in the aftermath of the State Court Judgment.

■ The use of the term "bad faith" in many of these cases is unfortunate. It carries with it a connotation that someone had a sinister purpose and has subjectively attempted to abuse the bankruptcy process in seeking relief from this Court.[20] This Court does not believe that its ability to dismiss a Chapter 11 case is dependent upon the finding of such subjective "bad faith." The question presented by these cases is a simple one. It is whether Chapter 11 of the United States Bankruptcy Code exists for the purpose of allowing a debtor the option of litigating a dispute with a single party (or, in this case, two parties with identical interests) in an alternate forum, when the debtor has no other need of or use for the bankruptcy court. The Court answers the question in the negative.

■ Debtors argue that the fact that this case has been pending for over two and one-half years as "cause" for its retention. The Court disagrees. Debtors no longer need the protection of this Court. The item which precipitated the filing of these bankruptcy cases, namely, the State Court Judgment, no longer exists. What the Debtors are asking this Court to do is to expend its resources to resolve a two-party dispute involving exclusive issues of state law.[21] The Court declines to do so.

---

20. Even though many of the factors justifying the dismissal of a Chapter 11 case for bad faith apply here, the Court finds no truly sinister or unworthy purpose in the filing of these cases. As testified by T. Scriminger at the April 23, 1999, hearing, the State Court Judgment and its aftermath had many negative effects on MECCO. The evidence is clear that Debtors filed bankruptcy based on the advice of their attorneys and accountants. These Chapter 11 cases certainly were not filed in such subjective bad faith and with such a motive to warrant sanctions and/or the award of attorney fees to Creditors. *See In re Nichols*, 221 B.R. 275 (Bankr.N.D.Okla.1998).

21. Both Debtors and Creditors have argued that one of the reasons Debtors are here is in order to avail themselves of § 502(b)(4), which allows the Court to reduce a claim "if such claim is for services of an insider or attorney of the debtor, [and] such claim ex-

Therefore, the Motion to Dismiss is granted.

In re

ceeds the reasonable value of such services." The Court disagrees. As is noted in the Oklahoma Appellate Opinion, under Oklahoma law,

> [P]arties are free to contract for a reasonable attorney's fee, but if the fee is challenged as excessive or exorbitant, the trial court should take evidence as to the reasonableness of the fee and has the power ... to fix an attorney's fee that is reasonable and commensurate with the work performed by the attorney.

*Oklahoma Appellate Opinion*, p. 12 citing *Security National Bank of Enid v. Bonnett*, 1980 OKCIVAPP 63, ¶ 9, 623 P.2d 1061, 1064.