**In re ELRS LOSS MITIGATION, LLC, Alleged Debtor.**

**No. 05–11191–M.**

United States Bankruptcy Court, N.D. Oklahoma.

June 6, 2005.

Timothy T. Trump, Tulsa, OK, for Plaintiff.

Mark A. Craige, Fred C. Cornish, Tulsa, OK, for Defendant.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Chief Judge.

This is the story of a failed economic marriage. On March 4, 2005, ELRS Loss Mitigation, LLC ("Loss Mitigation"), a corporation owned and operated by Ky Vargas ("Vargas"), was placed in an involuntary Chapter 7 bankruptcy case. The petition was filed by three creditors, Thomas Pogue ("Pogue"); Electronic Loss Recovery Services, L.L.C. ("Loss Recovery"), a corporation wholly owned and operated by Pogue; and Aleetco, an entity owned by Charles Payne ("Payne"), a

friend and business associate of Pogue. Thereafter, three additional creditors joined in the involuntary petition.

The driving force behind the involuntary petition is the dispute between Pogue and Vargas over the purchase of the business of Loss Recovery by Loss Mitigation. Pogue argues that the requirements for the filing of an involuntary petition have been met. Vargas argues that the involuntary petition was nothing more than a litigation tactic, filed in an attempt to change the balance of power between the two parties. Vargas demands that the case be dismissed and that damages be assessed against the petitioning creditors. The remaining petitioning creditors have stood mute. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Civil Procedure 52 and Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

### Jurisdiction

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C.A. § 1334(b).[1] Reference to the Court of this contested matter is proper pursuant to 28 U.S.C.A. § 157(a). The determination of whether an order for relief should be entered in an involuntary bankruptcy case is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(A).

### Burden of Proof

■ To be eligible to file an involuntary petition in bankruptcy, a creditor must be "the holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to

---

1. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* (West 2005). All other references to federal statutes and rules are also to West 2005 publications.

liability or amount[.]" [2] In order for a bankruptcy court to enter an order for relief in an involuntary proceeding, it must find that "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." [3] The burden of proof lies with the petitioning creditors to establish a prima facie case that their claims are not subject to a bona fide dispute. [4] The burden then shifts to the alleged debtor to present evidence of a bona fide dispute. [5] The petitioning creditors also carry the burden of proof to show that a debtor is not paying its debts as they become due. [6]

## Findings of Fact

At some undisclosed point in time prior to January 30, 2004, Pogue formed Loss Recovery as a limited liability corporation. Pogue was its sole shareholder. The business of Loss Recovery was the assessment and remediation of damages to electronic systems as the result of flood, fire, or other human or natural disaster. In laymen's terms, when a hurricane (or other such act of nature) wrought havoc upon the information technology of its victim, Loss Recovery stood ready to figure out what had been broken and how to fix it.

Most of the clients of Loss Recovery were insurance companies who contracted for remediation services on behalf of their insured. During the course of owning and operating Loss Recovery, Pogue developed significant business relationships with various insurers and other potential clients.

Vargas is a well educated businessman with experience in asset management and business planning. After several years in the employ of others, Vargas made the decision to acquire his own business. Negotiations for the purchase of Loss Recovery ensued between Pogue and Vargas. Vargas formed his own limited liability corporation, Loss Mitigation, as his corporate business vehicle. On January 30, 2004, Pogue, Vargas, Loss Recovery, and Loss Mitigation entered into an Asset Purchase Agreement (the "APA"). [7] Under the terms of the APA, Loss Mitigation acquired all of the assets of Loss Recovery, including equipment, tools, inventory, furniture, fixtures, accounts receivable, licenses, and the like, as well as the exclusive right to use the trade name "Electronic Loss Recovery Services." In exchange for these assets, Loss Mitigation and Vargas agreed to assume certain liabilities of Loss Recovery [8] and to pay Pogue a sum

2. § 303(b)(1) (This includes amendments made to this section under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, § 1234 (2005); amendments to this section took effect on April 20, 2005, and apply with respect to cases commenced under title 11 of the United States Code before, on, and after that date. *See* Pub.L. No. 109–8, § 1234(b)).

3. § 303(h)(1); *see supra* note 2.

4. *Bartmann v. Maverick Tube Corp.* 853 F.2d 1540, 1543–44 (10th Cir.1988).

5. *Id.*

6. *Id.* at 1546; *see also In re Harmsen*, 320 B.R. 188, 197 (10th Cir. BAP 2005); *In re*

*Brooklyn Res. Recovery, Inc.*, 216 B.R. 470, 482 (Bankr.E.D.N.Y.1997).

7. *Debtor's Ex. 1.*

8. Section 3.2 of the APA provides that "[a]s additional consideration for the Contemplated Transaction, Buyer shall pay, as and when due, all payments required in respect of the indebtedness of ELRS [Loss Recovery and Pogue, jointly and severally] *specifically listed on Attachment 3.2 hereof* and any income tax liability for TP [Pogue] for 2003." *Id.*, § 3.2 (emphasis added). Attachment 3.2 to the APA listed the following liabilities:

Current Liabilities:
| | |
|---|---|
| Current Accounts Payable: | $106,301.39 |
| Disney Visa: | $ 3,427.57 |

Long Term Liabilities:

of money based upon a sliding scale, dependent upon the profitability of Loss Mitigation. Under the terms of the APA, all rights to receive these monies were assigned by Loss Recovery to Pogue.[9] Payments were to be made over a 20–year

| | |
|---|---|
| Bank One—Ford Box Truck: | $ 33,270.00 |
| Dell Financial Services: | $ 5,274.39 |
| Charles Payne: | $ 71,875.00 |
| Pogue Debt: | $ 9,904.16 |
| Accountemps: | $ 2,900.00 |
| F & M Bank: | $ 33,787.07 |
| La Quinta Inns: | $ 15,713.55 |

*Id.*

9. Section 3 of the APA states that

As complete consideration for the transfer of the Assets and the Acquired Business to Buyer, and the covenants, representations and warranties of ELRS herein stated, *Buyer shall pay the ELRS Commission to TP [Pogue]. Seller acknowledges that Seller has previously transferred to TP all of Seller's right, title and interest in the ELRS Commission,* and the payment of the ELRS Commission to TP shall constitute good and adequate consideration to Seller for the covenants, representations and warranties of Seller herein stated.

*Id.,* p. 2 (emphasis added).

10. Section 7.2 to 7.4 of the APA reads as follows:

7.2 *Competition.* Each of TP and Seller hereby agrees that, during the period commencing on the date (the "Cessation Date") of any termination or cessation of the employment of TP by Buyer, for any purpose and in any capacity, including consulting (the "Employment") and ending on the third anniversary of the Cessation Date (the "Non–Interference Term"), each of the Pogue Group shall not, directly or indirectly, either as an individual, a partner or a joint venturer, or in any other capacity, within the Territory (as defined in Section 7.6 below), (1) invest (other than investments in publicly-owned companies which constitute not more than one percent (1%) of the voting securities of any such company) or engage in any Competitive Business (as defined below), or (2) accept employment with or render services to a Competitive Business as a director, officer, agent, employee or consultant.

7.3 *Non–Interference with Employee Relationships.* During the Non–Interference

period, and would aggregate not less than $2,000,000, nor more than $10,000,000. As part of the deal, Pogue and Loss Recovery agreed not to engage in any manner of competition with Loss Mitigation.[10] Loss Mitigation maintained the same business

Term, each of the Pogue Group shall not, directly or indirectly, on such Person's own behalf or on behalf of any Person, recruit, hire, induce, solicit, interfere with or otherwise direct away from any of the Vargas Group or attempt any of the foregoing or assist others to do the same (each a "Prohibited Employee Solicitation") any Person who at any time during the six month period preceding such Prohibited Employee Solicitation was an employee or agent of any of the Vargas Group for the purpose of engaging such Person to perform in' the Territory Services which are substantially similar or identical to the services provided by such Person to such member of the Vargas Group for or on behalf of any other Person engaged in a Competitive Business, whether such business is conducted by such member of the Pogue Group or any other Person.

7.4 *Non–Interference with Customer Relationships.* During the Non–Interference Term, each member of the Pogue Group shall not, except on behalf of a member of the Vargas Group or with the prior written consent of KV [Vargas], on behalf of such member of the Pogue Group or on the behalf of any other Person, in any role in which such member of the Pogue Group has duties and responsibilities substantially similar to those such member of the Pogue Group has performed for such member of the Vargas Group, solicit, contact, call upon or initiate communication with (each a "Solicitation") any customer or any actively sought prospective customer of any member of the Vargas Group with a view toward providing products and/or services that are competitive or potentially competitive with any products and services provided by such member of the Vargas Group during the Employment.

*Id.,* p. 6–7. The APA defines the "Pogue Group" as Loss Recovery, Pogue, and any of their affiliates; and the "Vargas Group" as Loss Mitigation, Vargas, and any of their affiliates. *Id.,* p. 1, ¶ 1.

premises, telephone number, fax number and trade name as had been used by Loss Recovery.

As part of the same transaction, Pogue entered into an employment agreement with Loss Mitigation (the "Employment Agreement").[11] The Employment Agreement provided that Pogue would be paid an annual salary of $100,000, and that he was entitled to a total of 9 weeks paid vacation during calendar year 2004. The Employment Agreement provided that either party could terminate Pogue's employment upon 30 days notice to the other party. If the employment of Pogue were terminated by Loss Mitigation, Pogue was to receive monthly payments of $6,500 to be applied to the amounts due under the APA. The Employment Agreement also imposed certain duties of loyalty and confidentiality upon Pogue, some of which survived the termination of his employment.[12]

One of Pogue's strongest business relationships was with the Hartford Insurance Company (the "Hartford"). One of the major projects/contracts secured by Loss Mitigation during 2004 was secured through the Hartford, and dealt with a Florida business identified as "Triple A Linen." Loss Mitigation, due in no small part to the efforts of Pogue, secured a contract to provide damage assessment and possible remediation services to Triple A Linen as a result of damages suffered by the information systems of Triple A Linen in a hurricane. The contract to provide these services (the "Triple A Contract") was considered by Vargas to be the key to the future of Loss Mitigation. Pogue was the main contact for both the Hartford and Triple A Linen during the course of performance of the Triple A Contract. Pogue spent considerable time on premises at

Triple A Linen as Loss Mitigation did its job.

On October 8, 2004, for reasons which were not disclosed, Vargas, on behalf of Loss Mitigation, terminated Pogue's employment. Pogue was directed to remove his personal belongings from the Loss Mitigation business premises and cease contact with all of its customers, including the Hartford and Triple A Linen. According to Pogue, Vargas directed him (if asked) to inform the Hartford and Triple A Linen that he was not returning to the job site because he was on vacation. Vargas denies asking Pogue to make any manner of false statement to Triple A Linen, the Hartford, or anyone else.

On the evening his employment was terminated, Pogue sent a message to all of his contacts at the Hartford from his home computer using his home e-mail address.[13] In the e-mail, Pogue informed those people of his termination. He thanked all of them for their friendship and their business and informed them that, due to "contractual obligations," he could no longer speak to them. He directed all further inquiries regarding the Triple A Contract or any other matter related to Loss Mitigation to Vargas. Pogue did not inform Vargas or Loss Mitigation of the existence of this e-mail. Pogue testified that he received a telephone call from a representative of the Hartford the next morning. According to Pogue, the Hartford threatened to terminate the Triple A Contract and any and all future business relationships with Loss Mitigation unless Pogue were returned to his former position.

In order to save the Triple A Contract, Pogue was hired by Loss Mitigation under an oral "sub-contractor agreement" to fin-

---

11. *Debtor's Ex. 2.*

12. *See Id.,* ¶ 3.

13. *Debtor's Ex. 12.*

ish tasks related to the Triple A Contract. Pogue claimed that under the oral agreement he was to be paid the sum of $50 per hour for time spent plus expenses, with the wages to be paid as earned, presumably on a weekly or bi-weekly basis. Vargas does not dispute the hourly rate; however, he testified that, due to the financial condition of Loss Mitigation, Loss Mitigation would "help" with the out-of-pocket expenses during the performance of the Triple A Contract and pay Pogue his hourly compensation once the Hartford paid Loss Mitigation. According to the accounting submitted by Pogue, at some point during the performance of his duties Pogue unilaterally raised his hourly rate from $50 to $105.[14] According to Vargas, this had the effect of taking from Loss Mitigation the profit margin which it expected to gain from Pogue's time spent on the Triple A Contract. On or about January 15, 2005, Pogue filed a lien upon the property which was the subject of the Triple A Contract in the amount of $27,235.20, claiming this amount as his wage and expense compensation.[15] Pogue was ultimately paid this amount by the Hartford, and the lien was released. The Triple A Contract represented the last business dealing between Loss Mitigation and the Hartford.

On January 12, 2005, Pogue presented Vargas and Loss Mitigation with a letter demanding the sum of $81,961.95, the amount Pogue believed he was owed under the APA.[16] The letter was signed "ELRS, LLC and Thomas Pogue By: Thomas W. Pogue." On the same day, Pogue sent a letter to Vargas and Loss Mitigation demanding the sum of $47,673.70 as being immediately due and owing under the Employment Agreement.[17] This letter was also signed "ELRS, LLC and Thomas Pogue By: Thomas W. Pogue." Both letters directed that all future communications be made through counsel.

After the issuance of these letters, the parties engaged in a series of negotiations through counsel. The Court was provided with copies of a series of e-mails between counsel for Vargas and Loss Mitigation and counsel for Pogue and Loss Recovery.[18] The e-mails, dated between January 20, 2005, and March 4, 2005, reflect an effort by the parties to resolve their differences without litigation. As one might expect, these negotiations focused on the resolution of the differences between Pogue and Vargas, without regard for any of the other creditors of Vargas and/or Loss Mitigation. In the e-mails, counsel for Pogue and Loss Recovery informed counsel for Vargas and Loss Mitigation of their intent to file a petition for involuntary bankruptcy if an amicable settlement could not be reached.[19]

---

14. *Debtor's Ex. 11*, p. 6.

15. *Id.*

16. *Creditors' Ex. 22.*

17. *Creditors' Ex. 25.*

18. *Debtor's Ex. 10.*

19. Consider the following portions of e-mails sent by counsel for Pogue and Loss Recovery to counsel for Vargas and Loss Mitigation:

 1. Friday, January 28, 2005, 10:06 a.m.: "My client revokes all previous settlement offers. In addition, although I met with bankruptcy counsel yesterday afternoon, I have not had time to pass this along to him—the final settlement terms and agreement will be subject to his review." *Debtor's Ex. 10*, Bates Stamp TP00697 (subsequent citations are to Bates Stamp only).

 2. Friday, February 25, 2005, 4:02 p.m.: "It has come to my attention that your client has been disposing of my client's assets. Although I am not handling the issue, it looks like your client is headed for an involuntary bankruptcy, at a minimum.... Your client has now escalated

While negotiations were underway, Pogue took other actions which he apparently believed were in his best interest. When he became aware that Loss Mitigation was attempting to sell a certain "box truck" in which Pogue claimed an interest, he contacted Sundance Equipment Company ("Sundance"), the business which had agreed to sell certain property for Loss Mitigation. Pogue informed Sundance of his belief that the box truck, which was one of the items Sundance had agreed to sell, was subject to his claim. He also told Sundance that he intended to take legal action to protect his interests, and that the legal action "may be a problem" for Sundance if they continued in their efforts involving property of Loss Mitigation.

Pogue also contacted the Bank of Oklahoma ("BOK"), the primary operating lender for Loss Mitigation. Pogue testified that he had no independent banking relationship with BOK. Pogue informed Ky Chaffin ("Chaffin"), a loan officer at BOK, of Pogue's belief that Loss Mitigation was in the process of selling a significant portion of its business assets which Pogue believed were subject to liens held by BOK and F & M Bank ("F & M"), another banking institution in the Tulsa area. Pogue testified that he contacted BOK because he felt they "had a right to know" of the activities of Loss Mitigation. Pogue further testified that it was his intent, as part of his communication with Chaffin, to inform Chaffin of Pogue's belief that Vargas "was fraudulently transferring assets that his bank [BOK] and F & M Bank had a security interest on." During the conversation, Pogue informed Chaffin of his intent to file an involuntary bankruptcy petition against Loss Mitigation. As part of a spirited cross-examination, Pogue admitted that he both knew and expected that his conversation with Chaffin would "upset" Chaffin. Pogue dismissed this effect by stating, "[s]ometimes the truth hurts."

One other act by Pogue caught the Court's attention. Pogue is a reserve deputy with the Tulsa Sheriff's Office. At some point in time after his termination and before filing this involuntary petition, Pogue appeared at the business premises of Loss Mitigation unannounced with two uniformed, armed police officers. Pogue and the officers proceeded to enter the business premises of Loss Mitigation. The purpose of the visit, or what actually transpired during the visit, was not described to the Court in any detail.

On the morning of March 4, 2005, Loss Mitigation surrendered its business premises to Pogue, together with all hard assets located thereon. Certain vehicles, including a Ford Expedition and the box truck which was the subject of Pogue's contact with Sundance, were also surrendered to Pogue. Control of Loss Mitigation's business bank accounts was not given to Po-

the situation to the point where he going [sic] to see an enormous amount of litigation." TP00733.

3. Thursday, March 3, 2005, 6:03 p.m.: "I am convinced that a settlement cannot be reached by keeping my client in the blind. I make no promises regarding 'litigation, bankruptcy or otherwise.'" TP00693.

4. Friday, March 4, 2005, 1:34 p.m.: "Please consider this e-mail as my client's final settlement demand. He is not interested in any counter-offers and will not agree to any extensions. These terms must be accepted in full by 4:30 pm today, as more particularly set forth below. A final settlement agreement incorporating the terms set forth below needs to be reduced to writing this weekend, with full payment by cashier's check on Monday. Unless your client agrees to all of the following terms by 4:30 today and I receive a fully executed copy of this term sheet by 4:30 pm today, I have been informed that Mr. Trump will commence an involuntary bankruptcy today." TP00738

gue. Pogue tested the vehicles to ensure that their motors were operational and signed a receipt acknowledging that these items had been surrendered to him. Pogue then changed the locks and the security codes on the business premises, the effect of which, in the words of Pogue, was to put Pogue "in definite custody and control" of the equipment and premises surrendered to him.

Notwithstanding these last efforts, the parties were unable to reach a settlement. True to his word, at 5:26 p.m. Friday, March 4, 2005, an involuntary petition was filed against Loss Mitigation.[20] The petitioning creditors included Pogue, Loss Recovery, and Aleetco, the business operated by Payne. Thereafter, on April 22, 2005, three additional creditors, Yale Uniform, Quantum Forms, and Holders Security, joined in the involuntary petition.[21] In the petition and joinders thereto, these creditors listed the following claims and amounts:

| Creditor | Claim Basis | Claim Amount |
|---|---|---|
| Pogue | Breach of Employment Contract | $ 44,327.49 |
| Loss Recovery | Breach of Asset Sales Contract | $2,061,475.99 |
| Aleetco | Breach of Contract | $ 105,036.00 |
| Yale Uniform | Breach of Contract | $ 781.84 |
| Quantum Forms | Breach of Contract | $ 188.17 |
| Holders Security | Breach of Contract | $ 88.00 |

Loss Mitigation was served with the involuntary petition, and timely filed its opposition on March 22, 2005.[22] In the opposition, Loss Mitigation disputed the standing of Pogue, Loss Recovery, and Aleetco to bring the involuntary petition, and also denied that it was failing to generally pay its debts as the same became due. Due to the fact that the other petitioners were added after the opposition was filed, no mention was made of them.

Upon the filing of the involuntary petition, BOK effectively terminated the line of credit which it had previously made available to Loss Mitigation. While Loss Mitigation has paid BOK the amounts which were owed to BOK, it has not been able to obtain a replacement line of credit. In addition, Loss Mitigation has secured no new business since the filing of the involuntary petition. Vargas testified to his belief that the filing of the involuntary petition, coupled with the loss of the line of credit, were key factors in the inability of Loss Mitigation to secure any new business. Vargas also believes that, should the involuntary petition be dismissed, Loss Mitigation will be able to secure a new line of credit, which in turn will enable the company to solicit and obtain new business. Vargas also testified that the filing of the involuntary hindered the ability of Loss Mitigation to make payments to its creditors. Vargas testified (without significant detail) that creditors of Loss Mitigation had refused payment because of their concern that any monies received from Loss Mitigation while it was under the shadow of an involuntary bankruptcy petition could be reclaimed as preferences.

### The Claims of the Petitioning Creditors

An evidentiary hearing on the involuntary petition and the opposition was held on May 4 and 5, 2005. At the hearing, the Court received evidence regarding the claims of the involuntary petitioners. The Court will make factual findings regarding each such claim.

### Pogue

In the involuntary petition, Pogue claimed to be owed $44,327.49 as a result of the breach of the Employment Agreement by Loss Mitigation. At the hearing

20. *See Docket No. 1,* Notice of Electronic Filing.

21. *See Docket Nos. 8, 9, and 10.*

22. *Docket No. 5.*

on the involuntary, Pogue testified that his claim was actually in the amount of $83,168.98.[23] According to Pogue, the primary reason for the increase was a doubling of the amount due as a penalty allowed under Oklahoma law.[24] The claim is based upon the annual salary of $100,000 plus 6 weeks of vacation, and can be summarized as follows:

| | |
|---|---|
| Unpaid wages: | $30,192.22 |
| Unpaid vacation: | $11,538.42 |
| Unpaid health insurance: | $ 1,200.00 |
| TOTAL: | $41,584.49 |
| Doubled for statutory penalties: | $83,168.98 |

It appears that Pogue's claim is not the sum of its parts. The Court believes that Pogue's claim using correct mathematics is $42,930.64, before any potential doubling.[25]

Loss Mitigation and Vargas take issue with Pogue's claim. Vargas testified that Loss Mitigation paid the health insurance premium for Pogue during the month of October 2004, as required under the Employment Agreement. Vargas and Loss Mitigation also reject the amount of vaca-tion pay claimed by Pogue. Under the Employment Agreement, Pogue was entitled to a total of nine weeks vacation in 2004. In his original demand letter to Loss Mitigation, Pogue demanded that he be paid for all nine weeks. In the damage calculations presented to the Court, Pogue altered his demand, and claimed to be owed for six weeks of vacation time. Vargas took issue with this amount. He noted that Pogue only supplied Loss Mitigation with his calendar for the months of May and June 2004.[26] During that time period, Pogue took three weeks of vacation for an extended trip to Florida. Also in that time frame, there were at least two days when Pogue did not work which he claimed did not constitute vacation days.[27] Pogue based this claim on the belief that he was entitled to "comp time" for hours spent working on the weekends. Vargas testified that Loss Mitigation had no formal or written policy regarding "comp time" and that, in the absence of detailed calendar

**23.** *Creditors' Ex. 27.*

**24.** Pogue relied upon the following Oklahoma statute for his assertion that his unpaid wage claim should be doubled:

A. Whenever an employee's employment terminates, the employer shall pay the employee's wages in full, less offsets, at the next regular designated payday established for the pay period in which the work was performed either through the regular pay channels or by certified mail postmarked within the deadlines herein specified if requested by the employee, unless provided otherwise by a collective bargaining agreement that covers the employee.

B. If an employer fails to pay an employee wages as required under subsection A of this section, such employer shall be additionally liable to the employee for liquidated damages in the amount of two percent (2%) of the unpaid wages for each day upon which such failure shall continue after the day upon which payment is required; or in an amount equal to the unpaid wages, whichever is smaller; provided, however, that for the purpose of such liquidated dam-ages such failure shall not be deemed to continue after the date of the filing of a petition in bankruptcy with respect to the employer if he thereafter shall have been adjudicated bankrupt upon such petition. OKLA. STAT. ANN. tit. 40 § 165.3 (West 1999).

**25.** The major component of the unpaid wage claim is based upon the difference between what Loss Mitigation actually paid Pogue ($2,500.00 on a bi-weekly basis, for a total amount paid of $52,500) and what Pogue claimed to be entitled to on a bi-weekly basis ($3,846.15, which is roughly $100,000 divided by 26). The difference between these two amounts is $1,346.15, which is also the difference between the amount owed based upon the Court's mathematics ($42,930.64) and Pogue's mathematics ($41,584.49).

**26.** *Debtor's Ex. 9.*

**27.** *Id.* at TP00841. The calendar entry for May 20, 2004, has the entry "12–7p Tom Off." The entry for the next day, May 21, 2004, states "8–7p Tom & Family in Houston Comfort Inn."

information from Pogue and in light of the fact that the calculations submitted by Pogue had changed on more than one occasion, he had no choice but to dispute the six weeks of vacation compensation claimed by Pogue. Indeed, if one assumes that the claim of "comp time" made by Pogue is unwarranted, the calendar submitted by Pogue would indicate that he took more than three weeks of vacation during the months of May and June 2004. Finally, Vargas takes issue with the statutory penalties claimed by Pogue, arguing that the amounts owed under the Employment Agreement are the subject of a good faith dispute.

In addition, Vargas and Loss Mitigation contend that Pogue breached duties of loyalty and confidentiality contained in the Employment Agreement. Vargas believes that Pogue hindered the ability of Loss Mitigation to perform its obligations under the Triple A Contract, ostensibly between

October 8, 2004, the date he was informed of his termination, and November 7; 2004, the date said termination became effective under the terms of the Employment Agreement. Admittedly, Vargas had little if any evidence to support this claim. Vargas contends that, given the fact that there was no pre-petition litigation between the parties and thus no procedural vehicle for the undertaking of discovery, it was not unreasonable to not have fully developed its evidence on this issue at the time of the hearing on the involuntary petition.

*Loss Recovery*

The largest claim raised in this involuntary petition belongs to Loss Recovery, which contends that it is owed not less than $2,061,475.99.[28] This claim allegedly arises out of the breach of the APA by Loss Mitigation. Pogue has summarized this claim as follows:

| | Accrued | Un-accrued |
| --- | --- | --- |
| Commissions due Electronic Loss Recovery Services L.L.C. | | $1,887.000.00 |
| 2004 | $ 100,000.00 | |
| January & February 2005 | $ 13,000.00 | |
| Legal Bills for Company Formation | $ 3,778.19 | |
| Default on F & M Bank Loan | $ 1,650.00 | $ 9,350.00 |
| Default on Truck Payments | $ 2,588.68 | $ 647.17 |
| Default on Building Lease (Contingent Estimate) | | $ 35,000.00 |
| Default on Ryder Lease (Contingent) | | $ 20,000.00 |
| Total Due Electronic Loss Recovery Services L.L.C. | $ 121,016.87 | $1,951,997.17 |
| Total Commissions Paid in 2004 | − 11,538.05 | |
| Net Accrued Claim | 109,478.82 | |
| Total of Accrued & Un-accrued Damages | $1,951,997.17 | |
| **Claim Amount** | **$2,061,475.99** | |

Unlike the claims made by Pogue under the Employment Agreement, this claim appears to have remained consistent, at least from the time of the filing of the involuntary petition.[29]

Vargas disputed several of the items on the damage calculation. With respect to the building lease payments, Vargas testified that Loss Mitigation never assumed the lease at issue, and the same remained the liability of Loss Recovery and/or Po-

---

**28.** *Creditors' Ex. 59.*

**29.** Vargas testified that he had been shown other damage calculations for the alleged

breach of the APA by Loss Mitigation which contained different figures. No such documents were offered or received into evidence.

gue. This testimony is consistent with the APA, which did not list the building lease as an assumed liability. There also was no evidence in the record as to the current status of the business premises, other than that Loss Mitigation has vacated the same. The Court does not know whether the business premises have been leased to a new tenant or whether Pogue or Loss Recovery has any financial exposure under the lease of those premises. With respect to the claimed liability on the "Ryder Lease," Vargas testified that the claimed number was not accurate, and that, moreover, said lease was not in default.[30] With respect to the claim for commissions under the APA, Vargas argued that the total amount paid is inaccurate,[31] and that with respect to the "unaccrued" claim for $1,887,000, the same is inaccurate in that it does not reflect the present value of those payments.

Loss Mitigation and Vargas claim that Loss Recovery and Pogue have breached the APA in a variety of respects and that, as a result of said breaches, the liability of Loss Mitigation under the APA is highly questionable. Relying heavily on Section 7 of the APA, which imposes various duties of non-interference upon Loss Recovery and Pogue, Vargas and Loss Mitigation claim that Loss Recovery and Pogue have "systematically disassembled" Loss Mitigation. They claim that Pogue contacted the Hartford in an intentional effort to destroy the business relationship between Loss Mitigation and the Hartford. They contend that Pogue violated his agreement not to compete with Loss Mitigation when,

in the course of performance of his duties under the oral "sub-contractor" agreement relating to the Triple A Contract, Pogue unilaterally increased his hourly rate to the rate which Loss Mitigation charged for his time. They allege that the filing of the lien by Pogue on the property which was the subject of the Triple A Contract further harmed the business relationship between Loss Mitigation, Triple A Linen, and the Hartford. Vargas alleges that Pogue conspired with Payne to interfere with the ability of Loss Mitigation to generate revenue. He also claims that Pogue contacted BOK and Sundance in order to cause damage to the business operations of Loss Mitigation. Vargas also alleges that the same purpose lay behind Pogue's visit to the business premises of Loss Mitigation in the company of uniformed, armed police officers.

During cross-examination, Vargas admitted that he had little, if any, evidence, other than what has been described above, to support his claim that Pogue and Loss Recovery acted in violation of the APA with the intent to harm Loss Mitigation. Vargas claimed to be aware of additional e-mails from Pogue to representatives of the Hartford which were intended to and did cause harm to Loss Mitigation, but that the same had been removed from the computers accessible to Loss Mitigation. Counsel for Loss Mitigation argued that, given that no litigation other than the involuntary petition was pending between the parties, there was no discovery mechanism available, and it would therefore be unreasonable for the Court to expect Var-

---

**30.** The "Ryder Lease" was not made a part of the record herein and the Court therefore has no knowledge of its terms.

**31.** The record would appear to support Vargas' claim in this regard. On January 12, 2005, Pogue and Loss Recovery sent a letter to Vargas and Loss Mitigation in which they stated that a total of $18,038.05 in commissions due under the APA had been paid. *See Creditors' Ex. 22.* At the trial of the involuntary petition, Pogue claimed that the amount of commissions paid was $11,538.05, which represents an apparent $7,500 reduction. Pogue did not explain the variance.

gas and Loss Mitigation to present significant evidence on this issue.

*Aleetco/Payne*

Aleetco is a sole proprietorship owned and operated by Payne.[32] Payne had been involved in a business relationship with Pogue and Loss Recovery for some period of time prior to the formation of Loss Mitigation. Payne and Pogue remain personal friends to this day. Payne had leased certain business equipment, consisting primarily of a trailer and equipment located therein (the "Trailer"), to Loss Recovery. The Trailer was used as a mobile work station by Loss Recovery and was a key element in its successful delivery of services.

On December 17, 2003, Vargas, apparently with an eye towards the acquisition of the assets of Loss Recovery, contacted Payne to discuss the possibility of acquiring the Trailer.[33] One day later, Loss Mitigation and Payne executed a memorandum of understanding for the purchase of the Trailer.[34] Under the terms of the memorandum, Loss Mitigation would pay a total of $75,000 for the Trailer over a 24–month period commencing in early 2004. Ultimately, Payne and Loss Mitigation executed a formal equipment purchase agreement and bill of sale with respect to the Trailer.[35] Under the terms of these documents, Loss Mitigation was to make 24 monthly payments of $3,125 to Payne in exchange for the Trailer. Although Payne executed a bill of sale to the Trailer, the certificate of title to the Trailer was not to be transferred until all payments under the equipment purchase agreement had been received by Payne.

Loss Mitigation made a total of six payments under the equipment purchase agreement, the last such payment having been made in October 2004, and credited to the payment due May 18, 2004.[36] Sometime after that date, Pogue contacted Payne and told him that the Trailer was about to be moved from a job which Loss Mitigation had completed. Payne asked Pogue to bring the Trailer through Trussville, Alabama. Pogue directed the driver of the Trailer to do so. When the Trailer arrived in Trussville, Payne took possession of the Trailer and has remained in possession of the Trailer ever since. Payne testified that he is holding the Trailer as "collateral," and that he intends to retain possession of the Trailer until the issues surrounding the involuntary bankruptcy case have been resolved.

The evidence regarding the amount of Payne's claim is, to put it kindly, unclear. According to one of the exhibits identified by Payne at his trial deposition, the remaining amount due and owing under the equipment purchase agreement was $56,250, which apparently represents the balance of the purchase price of $75,000 after deducting the amounts paid by Loss Mitigation, which totaled $18,750.[37] In the involuntary petition, Payne claimed to be owed the sum of $105,036. Upon questioning, Payne admitted that he had no idea how the number was generated, and that the amount was calculated by Pogue.[38] Payne further testified that due to the failure of Loss Mitigation to make pay-

32. For ease of reference, the Court will use the word "Payne" to refer to Payne and Aleetco.

33. *See Creditors' Ex. 67*, ex. 16 thereto.

34. *Id.*, ex. 17 thereto.

35. *Id.*, ex. 18 thereto.

36. *Id.*, ex. 19 thereto.

37. *Id.*

38. *Id.*, p. 27, line 16 to p. 28, line 6.

ments thereunder, the equipment purchase agreement was no longer valid and the total amount which he was currently owed was in excess of $151,000.[39] Once again, Payne admitted that all of the calculations upon which his claim was based were supplied to him by Pogue, and that he had no independent means of determining what he was owed.

Vargas testified to a completely different series of events. He acknowledged the execution of the equipment purchase agreement and the failure to make all of the payments thereunder. He acknowledged that Payne had taken possession of the Trailer, although Vargas claimed such repossession to have been wrongful. Most importantly, Vargas testified that he had a telephone conversation with Payne in January 2005, in which Payne agreed to take the Trailer in full satisfaction of all obligations which Loss Mitigation may have owed to Payne under the equipment purchase agreement or otherwise. Vargas considered the matter with Payne resolved until the filing of the involuntary petition listing Payne as a creditor.[40]

*Yale Uniform*

As its name implies, Yale Uniform provided uniform rental and cleaning to Loss Mitigation. It claims to be owed the sum of $781.84. Included in these charges are $154.52 in cleaning charges for the month of December 2004, and $627.32 in charges for rental uniforms that were not returned.[41] Yale Uniform did business with Loss Mitigation and its predecessor, Loss Recovery. On November 30, 2004, Loss Mitigation, through a letter authored by Vargas, informed Yale Uniform that due to a turndown in the business of Loss Mitigation, it would be terminating the services of Yale Uniform.[42] Loss Mitigation promised to return all uniforms to Yale Uniform by the end of January 2005. That promise went unfulfilled. Some of the uniforms remain in the possession of Pogue. Pogue testified that he has not been asked to return the uniforms to either Loss Mitigation or Yale Uniform.

*Quantum Forms*

Quantum Forms ("Quantum") is engaged in the business of printing items such as business cards. It also provides printing on items such as shirts. The invoices upon which Quantum bases its claim are dated December 17, 2004, and January 31, 2005. The former invoice is for services relating to the printing of the letters "ELRS" on a total of 60 t-shirts.[43] The amount charged for those services was $368.91. In addition, Quantum prepared business cards for Richard Sheldon, an employee of Loss Mitigation, at a cost of $121.40. According to a representative of Quantum, Loss Mitigation had overpaid Quantum the sum of $302.14 on prior invoices. Quantum credited the previous overpayment to the amount due under these invoices at the direction of Vargas.[44]

---

**39.** *Id.,* p. 10, line 10 to p. 12, line 4, and ex. 20 thereto.

**40.** The Court is well aware that there are inconsistencies in Vargas' testimony on this issue. Specifically, Vargas indicated more than once that the Trailer was an integral part of the business operations of Loss Mitigation, and that the company would be hard pressed to generate revenue without the use of the Trailer. Such testimony is not consistent with an offer to give the Trailer back to Payne. Fortunately, the conflict in this testimony need not be resolved in order for the Court to reach its decision.

**41.** *See Creditors' Ex. 69,* ex. 12 thereto.

**42.** *Id.,* ex. 14 thereto.

**43.** *See Creditors' Ex. 72,* ex. 8 thereto.

**44.** *Id.,* p. 6, lines 2 to 13.

### Holders Security

Holders Security ("Holders") provided alarm monitoring services for the business premises of Loss Mitigation. Holders provided this service to Loss Recovery prior to the sale to Loss Mitigation under the APA. Holders provided its services until the end of March 2005. The amount claimed due represents the service fee of $22.00 per month for the months of January through April of 2005. All amounts owed to Holders for services rendered prior to those dates have been paid in full. The invoices of Holders which were received into evidence show the party billed as "Electronic Loss Recovery Services." According to a representative of Holders, Holders considered the debt at issue to be owed to it by Loss Mitigation.[45]

### Payment of Debts by Loss Mitigation

The Court received evidence in various forms regarding whether Loss Mitigation was generally paying its debts as they fell due. Vargas testified that a list of 27 creditors found on an "Accounts Payable Aging Summary" of Loss Mitigation represented the creditors to whom Loss Mitigation owed monies as of the date the involuntary petition was filed.[46] Out of that list of 27 creditors, eleven (including Pogue's claim for his work as a subcontractor on the Triple A Contract) had been paid in full in the ninety day period prior to May 5, 2005. Of the sixteen remaining creditors, four had only current balances due. One creditor (Moreau Consultants) had never billed Loss Mitigation for any services rendered. Only two creditors, Aleetco (Payne) and Aerotek Commercial Staffing ("Aerotek"), had debts which were more than 90 days past due. The issues surrounding the claim of Payne have already been discussed in great detail.

Aerotek was a provider of highly skilled temporary employees, such as engineers. Vargas testified that Loss Mitigation disputed a significant portion of the Aerotek claim because the claim (or at least a significant portion thereof) was owed by Loss Recovery. The record supports the position taken by Vargas. Aerotek is not found in the list of creditors of Loss Recovery whose debts were assumed by Loss Mitigation under the APA.[47] The evidence before the Court indicates that the vast majority of services provided by Aerotek were provided prior to January 30, 2004, the effective date of the APA.[48] Upon questioning, a representative of Aerotek stated that she had no personal knowledge as to whether the employees supplied by Aerotek performed services for Loss Mitigation or Loss Recovery.[49]

The evidence before the Court is that the debt to F & M is not past due.[50] Moreover, a representative of F & M testi-

---

**45.** *See Creditors' Ex. 68*, p. 5, line 17 to p. 6, line 7.

**46.** *Creditors' Ex. 29*, p. 5.

**47.** The Court notes that the list of debts assumed by Loss Mitigation arguably includes $106,301.39 in current accounts payable. *Debtor's Ex. 1*, Attachment 3.2. However, the inclusion of current accounts payable does not specifically identify Aerotek, and the Court will not presume for purposes of its decision that the Aerotek payable was included in this number. The burden of establishing that fact lies with the petitioning creditors. They have not met that burden.

**48.** The testimony of Julie Mallis, a credit analyst for Aerotek, was submitted to the court in the form of a trial deposition. *Creditors' Ex. 75.* The Aerotek invoices were made an exhibit to the deposition. *Id.*, ex. 1 thereto. The aggregate amount of those invoices is $52,692.17. Of that amount, $43,964.77 represents billings for services performed before January 30, 2004. *Id.*

**49.** *Id.*, p. 12, lines 3 to 6.

**50.** *See Creditors' Ex. 70*, p. 9, lines 11 to 13.

fied to his belief that Loss Mitigation owed no legal liability to F & M.[51] At least some of the payments to F & M have been made by Pogue. One of the other debts which Loss Mitigation agreed to assume was a credit card debt described as the "Disney Card." The obligations due and owing under the Disney Card have been paid in full.

The Court received testimonial evidence on two other debts allegedly owed by Loss Mitigation. The first was a debt owed to an entity identified as "Grainger." The debt owed to Grainger appears to be for supplies used by Loss Mitigation to perform the Triple A Contract.[52] These supplies were ordered by Pogue at the time he remained an employee of Loss Mitigation. The debt totals $667.70, and is more than 60 days past due. The Court was also provided deposition testimony regarding the debt allegedly owed to Thrifty Rent–a–Car ("Thrifty").[53] That debt was for the rental of automobiles and totals $2,107.99, although the representative of Thrifty could not identify where or when the rentals at issue took place. According to a statement filed by Pogue in connection with his work as a subcontractor on the Triple A Contract,[54] Pogue incurred the obligations to Thrifty on November 16, 2004 ($839.57), November 24, 2004 ($240.00), and December 8, 2004 ($838.40), during the course of his subcontract work on the Triple A Contract. Pogue had those charges billed directly to Loss Mitigation. Given that Pogue was paid directly by the contractors as a result of his lien filed on the Triple A Linen project, the

Court determines that a bona fide dispute exists regarding whether Loss Mitigation or Pogue is responsible for the debt owed to Thrifty.[55]

The Court also heard the testimony of John Grace, a certified public accountant hired by Loss Mitigation to provide an expert opinion on the issue of whether Loss Mitigation was paying its debts as they fell due. Mr. Grace reviewed the books and records of Loss Mitigation as they related to accounts payable from January 2004 through April 2005. As he did so, Mr. Grace separated the accounts payable of Loss Mitigation into two categories: payables incurred to vendors "that were carried over from" Loss Recovery, and vendors with whom Loss Mitigation began to do business after execution of the APA. Mr. Grace reached the following conclusions:

1. With respect to those vendors which were not "carried over" from Loss Recovery, Loss Mitigation was paying its debts as they fell due.

2. In the summer of 2004, Loss Mitigation had been slow to pay some of its payables due to a reduction in income.

3. As of October 2004, Loss Mitigation was current on all of its payables with the exception of Aerotek and Technology Loss Resources, LLC, the successor corporation to Loss Recovery.

4. With respect to Aerotek, Loss Mitigation had paid Aerotek over

---

51. *Id.*, p. 11, lines 7 to 11.

52. *See Creditors' Ex. 71.*

53. *Creditors' Ex. 73.*

54. *Debtor's Ex. 11*, p. 7.

55. This conclusion is bolstered by the fact that Pogue sought to be compensated by Loss Mitigation for his mileage while working on

the Triple A Linen project. *See Debtor's Ex. 11*, p. 7. If Pogue were paid for his mileage and reimbursed for the expense of a rental car, it is possible that he would have in effect been reimbursed twice for the same expense. The Court makes no final determination in this regard, but merely notes the potential for dispute.

$51,000 in the first six months of 2004. Loss Mitigation was continuing to work with Aerotek when the dispute between Loss Mitigation, Vargas, Pogue, and Loss Recovery began.

5. With respect to Dell Financial Services, Loss Mitigation made regular monthly payments throughout 2004. This is consistent with the evidence submitted by the petitioning creditors, which showed that Loss Mitigation was current with Dell Financial Services.[56]

6. In his report, Mr. Grace assumed that Payne had been satisfied in full through his repossession of the Trailer.

7. With respect to La Quinta Inns, Loss Mitigation had made regular monthly payments through 2004. When the dispute arose between Loss Mitigation, Vargas, Pogue, and Loss Recovery, Loss Mitigation ceased making payments upon this debt.

8. In calendar year 2004, Loss Mitigation obtained goods and services from over 200 vendors. The vast majority of these vendors were paid in accordance with their contractual terms. Many of the vendors were paid through the use of a credit card, which means that, for all practical purposes, those vendors were paid in cash.

9. In calendar year 2004, Loss Mitigation incurred over $800,000 in liabilities, the vast majority of which were paid.

On the basis of these factors, Mr. Grace opined that Loss Mitigation had been paying its bills as they fell due.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Conclusions of Law

This case marks the first contested involuntary petition in the eight years since this judge took the bench. The sparing use of involuntary bankruptcy by unhappy creditors is not surprising, given the dire consequences that the debtor and creditors may suffer. Consider the following statement:

The filing of an involuntary bankruptcy petition is, to say the least, a serious matter. Such a filing is a public statement by creditors that the alleged debtor is in enough financial difficulty that the power of a federal bankruptcy court is appropriately invoked to force the debtor to address the problems. In a commercial setting, an involuntary filing may have a number of consequences, ranging from plummeting employee morale, to lost customers, credit problems, and damage to a businesses' reputation. In a filing made against an individual, many of the same concerns exist, coupled with embarrassment on both a personal and a professional level. Because of this, "[t]he filing of an Involuntary Petition should not be lightly undertaken. Even the good-faith filing of such a petition creates onerous circumstances for a debtor." *In re Advance Press & Litho, Inc.*, 46 B.R. 700, 702 (Bankr. D.Colo.1984).

While Congress recognized that filing an involuntary bankruptcy case is sometimes necessary and appropriate, it also recognized the harm that can be caused by an unjustified filing. An alleged debtor who is subjected to an unjustified

**56.** *See Creditors' Ex. 29,* p. 5.

filing can move to dismiss the petition and, under certain circumstances, be awarded sanctions. 11 U.S.C. § 303(i). Sanctions are potentially available under this section if three conditions are met: the court dismissed the involuntary petition, the dismissal was not based on consent of the parties, and the alleged debtor preserved the right to recover under the statute. *See In re R. Eric Peterson Constr. Co.,* 951 F.2d 1175, 1179 (10th Cir.1991).[57] Given the consequences to a debtor and the risks of damage awards to the unsuccessful petitioners, the filing of an involuntary bankruptcy can easily turn into a game of economic Russian roulette.

 In order to determine the propriety of a contested involuntary filing, a bankruptcy court must undertake a two-part analysis. Initially, the court must determine that the creditors who brought the petition are eligible to do so. If the petitioning creditors lack standing, the bankruptcy court lacks jurisdiction over the case, and the case must be dismissed. In addition, the court must make a finding that the alleged debtor is not paying its debts as those debts fall due. If the debtor is paying its debts as they fall due, the case should not go forward. In this case, Loss Mitigation has filed an answer contesting each of these points.

*Eligibility of the Petitioning Creditors*

The filing of an involuntary petition is governed by § 303(b) of the Bankruptcy Code, which provides that:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title-

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $12,300 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $12,300 of such claims[.] [58]

This section sets out both quantitative and qualitative requirements: if there are more than twelve eligible creditors, the petition must be brought by not less than three such creditors. Moreover, the claims of the petitioning creditors must not be subject to "bona fide dispute." The petitioning creditors admit that Loss Mitigation has more than 12 such creditors and that, accordingly, the petition must be filed by not less than three creditors whose claims are not in bona fide dispute.[59]

**57.** *In re Cadillac by DeLorean & DeLorean Cadillac, Inc.,* 265 B.R. 574, 580 (Bankr. N.D.Ohio 2001) (footnote omitted); *see also In re Brooklyn Res. Recovery, Inc.,* 216 B.R. 470, 486 (Bankr.E.D.N.Y.1997) ("Involuntary bankruptcy is an extreme remedy with dire consequences upon a business enterprise. Such a remedy exists as an avenue of relief for the benefit of the overall creditor body of troubled businesses. Involuntary bankruptcy

was not intended to redress the special grievances, no matter how legitimate, of particular creditors of a business otherwise holding its own.").

**58.** § 303(b)(1) and (2).

**59.** *See Petitioning Creditors' Closing Argument, Docket No. 18, p. 1* ("The statute [§ 303(b)] requires that there be at least three petition-

■ The United States Court of Appeals for the Tenth Circuit has provided significant guidance on what it takes for a claim to be considered subject to a bona fide dispute:

> For creditors to successfully petition for involuntary bankruptcy, the bankruptcy court must determine that the creditors have standing and that the debtor generally has not been paying his debts as they become due. Pursuant to 11 U.S.C. § 303(b)(1), a petitioning creditor does not have standing when its debt is subject to a bona fide dispute. The term "bona fide dispute" is not defined in the Code and has been the subject of much debate. We choose to adopt the standard propounded by the Seventh Circuit as to what constitutes a bona fide dispute: "the bankruptcy court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of debt." The court need not determine the probable outcome of the dispute, but merely whether one exists. Once the petitioning creditor establishes a prima facie case that its claim is not subject to a bona fide dispute, the burden shifts to the debtor to present evidence of a bona fide dispute. Under this objective approach, the debtor's subjective intent does not control whether a claim is considered to be subject to a bona fide dispute.[60]

The position taken by the United States Court of Appeals for the Tenth Circuit falls well within the mainstream of legal thought on this issue.[61]

Six creditors have asked this Court to place Loss Mitigation in an involuntary Chapter 7 bankruptcy case. The question is whether at least three of those creditors have claims which total more than $12,300 and are not in bona fide dispute. The Court will consider the claims one by one.

### 1. Loss Recovery

■ Loss Recovery claims to hold a non-contingent claim against Loss Mitigation in the amount of $109,478.82.[62] Although Loss Recovery claimed to be owed over two million dollars in the original involuntary petition, it has eliminated the amounts which it acknowledges have not yet accrued, and it confines its claim to the amounts which Pogue believes are currently due and owing. The question is whether any of this debt is the subject of bona fide dispute.

The largest amount of Loss Recovery's claim is for unpaid commissions under the APA. The problem with this claim is that it appears to be owed to Pogue, and not to Loss Recovery. Section 3 of the APA states that

> As complete consideration for the transfer of the Assets and the Acquired Business to Buyer, and the covenants, representations and warranties of ELRS

---

ers with aggregate claims in excess of $12,300. On its face, there are six creditors with total aggregate claims well in excess of the statutory limit.") (hereafter *"Petitioners' Argument"*).

**60.** *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1543–44 (10th Cir.1988) (citations and footnotes omitted).

**61.** *See, e.g., Liberty Tool, & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.)*, 277 F.3d 1057, 1064 (9th Cir.2002);

*Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 221 (5th Cir.1993); *Rimell v. Mark Twain Bank (In re Rimell)*, 946 F.2d 1363, 1365 (8th Cir.1991); *In re Manhattan Indus., Inc.*, 224 B.R. 195, 199 (Bankr. M.D.Fla.1997); *In re Ballato*, 252 B.R. 553, 556–57 (Bankr.M.D.Fla.2000). This list is intended to be illustrative rather than exhaustive.

**62.** *See supra* note 27 and accompanying text.

herein stated, *Buyer shall pay the ELRS Commission to TP [Pogue]. Seller acknowledges that Seller has previously transferred to TP all of Seller's right, title and interest in the ELRS Commission,* and the payment of the ELRS Commission to TP shall constitute good and adequate consideration to Seller for the covenants, representations and warranties of Seller herein stated.[63]

This language could not be more clear nor unequivocal. To the extent Loss Recovery claims a right to receive commissions under the APA, that claim must fail. As of the date of execution of the APA, Loss Recovery had no right to receive any commissions under the APA. That right had been absolutely assigned to Pogue. The Court thus removes the amount of the alleged commission, as well as the credit for payments received thereon, from the claim of Loss Recovery.

The remaining portions of the Loss Recovery claim relate to unpaid debts owed for legal bills relating to company formation, and unpaid obligations owed to F & M Bank as well as certain "truck payments." With respect to each of these items, Pogue testified that he, *individually,* paid these items. The payments to F & M Bank and upon the "truck loan" were paid after the formation of Loss Mitigation, at a time when (according to Pogue) Loss Recovery had ceased all business operations. In addition, Pogue testified that he made the F & M Bank and "truck loan" payments because he was personally liable for them. There is no evidence in the record which would indicate that any collection efforts on these items have been undertaken against Loss Recovery. The Court concludes that these claims, to the

extent they exist, are held by Pogue, and not by Loss Recovery. The Court thus determines that Loss Recovery does not hold a claim against Loss Mitigation, and may not be considered a creditor for purposes of the involuntary petition.

### 2. Pogue

■ Pogue now claims to be owed the sum of $83,168.98 under the Employment Agreement.[64] As previously noted, this number has been somewhat of a moving target, having ballooned from $43,730.67 in Pogue's original demand, and $44,327.49 in the original involuntary petition.[65] This claim in its final form was comprised of four elements: unpaid wages, unpaid vacation time, health insurance premiums, and statutory penalties. Loss Mitigation and Vargas dispute all amounts due on the basis of an alleged breach of the Employment Agreement by Pogue. Vargas admitted that he had as of yet obtained little or no concrete evidence of these alleged breaches but argued that he was not in a position to have completed meaningful discovery on those issues.

With respect to the amount of wages, while the exact amount may be subject to some manner of fine tuning, the Employment Agreement clearly states that Pogue was to be paid an annual salary of $100,000, and that he was entitled to 30-days notice of his termination. Using October 8, 2004, as the date Vargas informed Pogue of his termination, Pogue was entitled to be paid a salary through November 7, 2004. For the bi-weekly periods between January 11, 2004, and October 30, 2004, Pogue was paid $2,500.00 per period, which was $1,346.15 per period less than he was entitled to on a pro-rated basis. Taking this number and multiplying it by a

---

63. *Debtor's Ex 1,* p. 2 (emphasis added).

64. *Creditors' Ex. 27.*

65. *See Creditors' Ex. 25,* and *Docket No. 1.*

total of 21 pay periods between those dates, it would appear that Pogue was owed not less $28,269.15 for unpaid wages under the Employment Agreement. This calculation sets aside any issue regarding vacation pay, insurance premiums, or statutory penalties. Given that the sum of $28,269.15 exceeds the $12,300 required under § 303(b)(1), the Court need not and will not address the disputes as to those issues.[66]

■ The next question is whether the claims made by Loss Mitigation and Vargas against Pogue are sufficient to defeat Pogue's status as a creditor. It is well established that "the debtor's assertion of counterclaims, even if of substance, does not render the petitioner's claim the subject of a bona fide dispute."[67] However, if the existence of a counterclaim is shown which exceeds the amount of the original claim, the principle of offset may operate to eliminate the claim of the petitioning creditor for purposes of an involuntary case.[68]

Vargas testified in some detail regarding the actions undertaken by Pogue which he felt were in breach of both the APA and the Employment Agreement. He also provided a detailed spreadsheet which, in his eyes, outlined the degree of damage to the value of Loss Mitigation as a result of Pogue's conduct.[69] The Court has reviewed the testimony and the exhibit in great detail and concludes, for the purposes of determining whether Pogue has standing as a creditor to bring an involuntary action, that the evidence is not sufficient to serve to offset the claims held by Pogue. Vargas readily admitted that, while his suspicions were strong, he could not present to the Court any concrete evidence to support them. Were the Court to find that Vargas' suspicions were sufficient to create a bona fide dispute, it would be replacing the objective test required by *Bartmann* with a subjective test, a result directly contrary to controlling precedent. With respect to the itemization of damages, while the Court notes Vargas's substantial business background, he was not recognized as an expert on that issue. In the end, the Court finds Vargas's estimates of damages to Loss Mitigation to be both exaggerated and unreliable.[70] The Court finds that Pogue is a

66. The Court is aware that, under its analysis of the APA, Pogue is the holder of the right to payment of any commissions due under the APA. Given that the Court has found that Pogue holds a claim under the Employment Agreement in excess of the minimum amount necessary for the maintenance of an involuntary petition, the Court does not make an assessment of his rights to payment under the APA.

67. *Chicago Title Ins. Co. v. Seko Inv., Inc. (In re Seko Inv., Inc.)*, 156 F.3d 1005, 1008 (quoting *In re Drexler*, 56 B.R. 960, 969 (Bankr. S.D.N.Y.1986); and cases cited therein).

68. *Id.; In re Audio Visual Workshop, Inc.*, 211 B.R. 154, 158 (Bankr.S.D.N.Y.1997) ("If established, the counterclaim and corresponding setoff will be relevant under § 303(b)(1) in determining the amount of [petitioning creditor's] claim or under § 303(h)(1) in determining whether Alleged Debtor is generally pay-

ing its debts as they become due."); *In re Manhattan Indus., Inc.*, 224 B.R. 195, 200 (Bankr.M.D.Fla.1997); *In re Drexler*, 56 B.R. 960, 969 (Bankr.S.D.N.Y.1986).

69. *Debtor's Ex. 4.*

70. For example, Vargas calculates damages as the present value of EBITDA, or Earnings Before Interest, Taxes, Depreciation, and Amortization. EBITDA has been criticized as being an easily manipulable and often misleading measure of profitability. *See, e.g.,* U.S. SECURITIES AND EXCHANGE COMMISSION, Division of Corporate Finance: Frequently Requested Accounting and Financial Reporting Interpretations and Guidance, § II(C), March 31, 2001 ("Some registrants choose to present a non-GAAP financial measure such as EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) or FFO (funds from operations) in their disclosure documents.

creditor for purposes of this involuntary petition, and that he holds a claim in excess of $12,300.

### 3. Payne/Aleetco

Under the test outlined in *Bartmann*, the Court needs to determine whether, using an objective standard, a legal or factual basis for disputing the claim exists.[71] Issues of fact which would preclude the granting of summary judgment on a claim have been held to be a sufficient basis for finding the claim to be in "bona fide dispute."[72] Some courts have held that the claim that a debt has been forgiven is sufficient to raise an issue regarding the bona fide nature of the claim.[73]

The Court has little difficulty finding a genuine dispute regarding the claim of Payne/Aleetco. Vargas testified without objection that he had a conversation with Payne in which Payne agreed to keep the Trailer in full satisfaction of any debt owed to him. This in and of itself would be sufficient basis upon which to find that a dispute exists. However, there is more. The testimony of Payne is a model of obfuscation. He acknowledges the existence of the equipment purchase agreement, admits executing the same, and then claims to be owed amounts far in excess of any set forth therein. He admits that he has no idea what he might be owed and relies solely upon the calculations supplied to him by Pogue. There are massive issues of fact about what manner of arrangement exists between Loss Mitigation and Payne, what amount is actually owed, and/or whether Payne has forgiven all debt in exchange for the retention of the Trailer. Payne is not the holder of a bona fide claim for purposes of this involuntary case.[74]

### 4. Yale Uniform

Yale Uniform has joined in the involuntary petition claiming to be owed the sum of $781.44. The amount reflects monies due for services rendered and for property (uniforms) not returned to Yale Uniform. Loss Mitigation has not disputed the calculations by Yale Uniform; instead, it alleges that Yale Uniform does not hold a bona fide claim against Loss Mitigation because: (1) the invoices supplied by Yale Uniform list Loss Recovery, not Loss Mitigation, as the contracting party; and (2) part of the charges for property not returned are for property which remains in the possession of Pogue. The Court rejects both arguments.

There can be no doubt that Yale Uniform supplied goods and services to Loss Mitigation. When the time came that Loss Mitigation could no longer afford the services of Yale Uniform, Vargas authored the letter discontinuing those services.[75] Vargas was in direct contact with representatives of Yale Uniform regarding their

Although such measures can be useful in some circumstances, an unbalanced presentation can be confusing and lead to undue reliance on the measure by investors."), *at* http://www .sec.gov/divisions/corpfin/guidance/cfactfaq.htm.

**71.** *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1544 (10th Cir.1988).

**72.** *In re Stroop*, 51 B.R. 210 (D.Colo.1985).

**73.** *In re Atwood*, 124 B.R. 402, 408 (S.D.Ga. 1991); *In re Caucus Distribs., Inc.*, 106 B.R. 890, 916–18 (Bankr.E.D.Va.1989).

**74.** In its closing argument, Loss Mitigation attacked the security interest held by Payne in the Trailer, and argued that, as a result, the claim held by Payne was subject to a bona fide dispute. Given the factual discrepancies outlined by the Court above, the Court sees no need to reach these legal issues.

**75.** *Creditors' Ex. 69*, ex. 14 thereto.

business arrangements.[76] Given the testimony of Grace that Loss Mitigation was current with all of its trade creditors as of October 2004, and that Vargas saw fit to send Yale Uniform a notice of cancellation of contract on November 30, 2004, the Court does not consider it presumptuous to conclude that Loss Mitigation made payments to Yale Uniform for services provided in 2004. The fact that Yale Uniform held its account in the name of Electronic Loss Recovery Services is insignificant, given that, under the APA, Loss Mitigation was given "the exclusive right to use the name 'Electronic Loss Recovery Services,' and any name similar to that name."[77] Moreover, under the terms of the APA, the business acquired by Loss Mitigation included "all agreements, rights, and business relationships with any Persons, customers, suppliers, licensees, clients and others[.]"[78] Given this state of affairs, Loss Mitigation can hardly cry foul due to the fact that suppliers who had previously done business with Loss Recovery continued to do business with Loss Mitigation, and did so without changing the name of the business on their records.

██ It is equally irrelevant that a portion of the Yale Uniform claim results from Pogue's failure to return uniforms to Loss Mitigation. No one is disputing that the uniforms are the property of Yale Uniform. If Pogue has not returned them to Loss Mitigation, that is a matter between Pogue and Loss Mitigation and cannot be held to somehow affect or reduce the liability of Loss Mitigation to Yale Uniform. The Court finds that Yale Uniform is a valid petitioning creditor in this case.

### 5. Quantum Forms

The reasoning which the Court has applied to Yale Uniform is equally useful in considering the claim of Quantum Forms. Quantum Forms supplied items to representatives of Loss Mitigation (Richard Sheldon and Pogue, both of whom were, at the time of the transactions in question, employees of Loss Mitigation). Even though the invoices list "ELRS" as the creditor, Loss Mitigation was assigned the right to use this name. The Court finds that, as of the date of the filing of the involuntary petition, Loss Mitigation owed Quantum Forms the sum of $188.17, thus making Quantum Forms a creditor for purposes of joining in the involuntary petition.

### 6. Holder Security

██ Holder Security ("Holder") is in the business of monitoring security systems. It provided those services for the business premises used by Loss Mitigation in 2004. The records of Holder identify its customer at those premises as "Electronic Loss Recovery Services," "LEEC Loss," "Electronic L," and "ELRS."[79] Most of the analysis set forth above applies to Holder. There are two interesting twists to the Holder claim: it includes fees for services rendered after Pogue took control of the business premises of Loss Mitigation; and it appears possible, as of the date of the involuntary petition, that there were no outstanding invoices due from Loss Mitigation to Holder. In her trial deposition, a part owner of Holder testified that of the amount claimed ($88.00), one half ($44.00) represented services provided for the months of April and May of 2005, at a time when Loss Mitigation had vacat-

---

76. *Id.*, p. 9, line 19, to p. 10, line 18.

77. *Debtor's Ex. 1*, § 1(h), p. 2.

78. *Id.*, § 1 (definition of "Acquired Business"), p. 1.

79. *Creditors' Ex. 68*, ex. 15 thereto.

ed the business premises. The Court was not provided with a copy of any contract between Holder and Loss Mitigation from which it could determine whether Holder was entitled to charge Loss Mitigation for services provided after Loss Mitigation vacated the premises. Moreover, Holder could not state with certainty when or how Loss Mitigation had been billed for these most recent services. The Court finds the claim of Holder to be the subject of a bona fide dispute, and Holder ineligible to join the involuntary petition in this case.

■ Of the six creditors who have filed or joined in the involuntary petition, only three are qualified to do so. The claims of those three creditors aggregate more than the statutory requirement of $12,300. However, the work of the Court on this point is not yet complete. Loss Mitigation argues that, since Pogue, Loss Recovery, and Payne brought the original petition in bad faith, the Court should not allow for the joinder of additional creditors.

■ There certainly is some support for the position advanced by Loss Mitigation.[80] Other courts have held that where a petition is defective, the petitioning creditors should be given an opportunity to find additional creditors.[81] This Court concludes that the better approach is to deal with issues of bad faith at the time the Court considers whether to allow the bankruptcy to proceed rather than at the time the petitioner wishes to join the case.

This Court believes that, whether a petitioner is one of the original filers, or joins the petition at a later date, that petitioner undertakes significant responsibilities and assumes the risks set forth in § 303(i).[82] Were the Court to in effect dismiss the petitioner at this stage of the proceeding, it would be eliminating those risks for that creditor. The Court declines to do so, for reasons which will become obvious later in this opinion.

*Payment of Debts as They Fall Due*

Having found a sufficient number of creditors who hold claims in the necessary amount, the next step is to determine whether (to paraphrase § 303(h)(1)) Loss Mitigation is generally not paying its debts as the same fall due. Courts generally employ one of two tests in making their decision. One test is somewhat mathematical in nature, while the other test requires the court to take a holistic view of the alleged debtor and the dispute which brought it to the courthouse steps. Each test is applied as of the date of the filing of the involuntary petition.[83] There is no expressly binding authority in this Circuit on which test is to be applied. For that reason, the Court will apply each test to the facts at bar.

■ The mathematical test was well described by the court in the *Better Care* decision:

whether signing the initial petition *or later joining as a petitioner* under section 303(c), should expect to pay the debtor's attorney's fees and costs if the petition is dismissed.") (emphasis added).

**80.** *Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 716 (4th Cir. 1993).

**81.** *In re Kidwell*, 158 B.R. 203, 211 (Bankr. E.D.Cal.1993). *See also Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540 (10th Cir.1988) (creditor allowed to join after original petitioning creditor withdrew).

**82.** *In re Kidwell*, 158 B.R. at 217 ("Thus, any petitioning creditor in an involuntary case,

**83.** *See In re Better Care, Ltd.*, 97 B.R. 405, 408 (Bankr.N.D.Ill.1989) (and cases cited therein); *In re Smith*, 243 B.R. 169, 189 (Bankr. N.D.Ga.1999); *see also In re Harmsen*, 320 B.R. 188, 197 (10th Cir. BAP 2005).

In applying the "generally not paying" test, courts have developed a two-step inquiry. The first step is to determine which debts the debtor was paying as of the filing of the petition and which debts the debtor was not paying as of that time. *See In re R.N. Salem Corp.*, 29 B.R. 424, 428 (S.D.Ohio 1983).

Once the court has determined that there are debts the debtor is not paying as they become due, the court engages in the second step of the inquiry. That step requires the court to compare the number and amount of unpaid debts with the number and amount of paid debts. That comparison is to take into account the materiality of that nonpayment as well as the debtor's general conduct of its financial affairs. *See In re The Leek Corporation*, 52 B.R. 311, 314 (Bankr.M.D.Fla.1985); *In re Reed*, 11 B.R. 755, 760 (Bankr.S.D.W.Va.1981).

This second step of the inquiry has been alternatively formulated as requiring the court to examine whether the debtor has regularly missed a significant number of payments to creditors or has regularly missed payments which are significant in amount in relation to the size of the debtor's operation. Just as the larger the operation, the larger the size of the missed payments required for involuntary relief, so also the more creditors, the larger the number of missed creditors required for involuntary relief. *In re All Media Properties, Inc.*, [5 B.R. 126, 143 (Bankr.S.D.Tex.1980)].[84]

Other courts have also applied the test espoused in *Better Care*.[85] In applying this test, any debts which are the subject of a bona fide dispute are to be removed from the equation.[86] If a debt is the subject of a genuine dispute, one cannot expect the debtor to pay that debt unless and until the dispute is resolved.

■■■ In the present case, the evidence shows that Loss Mitigation paid over 200 creditors a total in excess of $800,000 in the year prior to the filing of the petition. Vargas, testifying using the accounts payable aging summary of Loss Mitigation as a reference,[87] identified a total of 16 creditors with claims in the aggregate amount of $79,788.81 which were unpaid on the date of filing.[88] One of the claims listed is the claim made by Payne/Aleetco ($18,-750.00), which the Court has already found to be subject to a bona fide dispute. The largest of those claims, the claim of Aero-

**84.** *In re Better Care, Ltd.*, 97 B.R. at 408 (citation edited).

**85.** *See, e.g., Union Bank of Switzerland v. Deutsche Fin. Servs. Corp.*, 2000 WL 178278 (S.D.N.Y.2000); *In re Norris*, 183 B.R. 437, 456 (Bankr.W.D.La.1995) (cited with approval in *In re Harmsen*, 320 B.R. at 202); *In re Ballato*, 252 B.R. 553, 557 (Bankr.M.D.Fla. 2000); *Fed. Fin. Co. v. DeKaron Corp.*, 261 B.R. 61, 65 (S.D.Fla.2001).

**86.** *Gen. Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1504 n. 42 (11th Cir.1997).

**87.** *Creditors' Ex. 29*, p. 4.

**88.** The Court is well aware that the record is less than crystal clear as to when some of the debts listed on *Creditors' Ex. 29* were paid and that it is possible that some of these creditors were paid after the petition was filed. To the extent the record on this issue is unclear, the consequences of the lack of clarity fall upon the petitioning creditors, who have the burden of proof to show that Loss Mitigation was not paying its debts as they fell due. *In re Caucus Distribs., Inc.*, 106 B.R. 890, 918 (Bankr.E.D.Va.1989). *See also Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1546 (10th Cir.1988). Where the record is unclear, the Court gives the benefit of the doubt to Loss Mitigation, and assumes that those debts were paid prior to the filing of the involuntary petition. *See Bartmann*, 853 F.2d at 1546 (determination should be made as of the date the involuntary petition was filed).

tek ($52,692.17), is also subject to dispute for the reasons stated above. This leaves a total of $8,346.64 in unpaid claims, other than the claims held by Pogue. Five of those claims (Airgas Mid South, Culligan of Tulsa, MCI, Progressive, and Thrifty Car Rental) were current or less than 30 days past due. Even if one includes the various and sundry utility claims advanced by the petitioning creditors as evidence of unpaid debts, the amount unpaid remains minimal; in addition, several of the debts so identified by the petitioning creditors were either small in amount, paid, or were billed after the filing of the involuntary petition.[89] The amount of these "debts" totaled $6,056.67. Of that amount, $3,886.86 has been paid, and $1,244.02 was either unbilled or not due prior to the date of the filing of the involuntary petition. This leaves the whopping sum of $925.79 as due and owing to these creditors as of the date of the filing of the involuntary petition. It thus appears that Pogue is the only significant creditor which has not been paid in this case. Given the number of creditors which Loss Mitigation has paid on a regular basis and the amount they have been paid, the Court concludes that under the test outlined in *Better Care*, Loss Mitigation has generally been paying its debts as the same become due.

■ In *Bartmann*, the United States Court of Appeals for the Tenth Circuit espoused a somewhat broader and more flexible test for determining whether an involuntary debtor was generally paying its debts as they fell due than the simple mathematical test outlined above. The Court of Appeals stated that "bankruptcy court[s] should examine the totality of the circumstances, balancing the interests of the debtor with those of the creditors." [90] In a recent case, the Bankruptcy Appellate Panel for the Tenth Circuit endorsed the use by a bankruptcy court of the following factors in making such a "totality of the circumstances" analysis:

1. Whether the filing of an involuntary petition was in the best interests of all creditors of the debtor;

2. Whether the petitioning creditor had no other adequate remedy under state law;

3. Whether the motives of the petitioning creditor were "something other than a self-centered desire to get paid";

4. Whether the filing of an involuntary bankruptcy would cause harm to businesses employing the services of the debtor or to creditors of those businesses; and

5. Whether the filing of the involuntary bankruptcy case was an effort at forum shopping by the petitioning creditor.[91]

This list of factors is not exhaustive; as its name implies, the totality of the circumstances test is by its very nature a test which must be undertaken on a case by case basis.[92]

■ The Court finds that, under the totality of the circumstances test, Loss Mitigation has been paying its debts as they generally fall due. One of the circumstances which the Court is relying on

---

**89.** *See Creditors' Exs. 34–40 & 50–53.*

**90.** *Bartmann*, 853 F.2d at 1546 (citations omitted).

**91.** *In re Harmsen*, 320 B.R. at 197.

**92.** *Id.* at 198 ("[T]he Tenth Circuit utilizes a flexible case-by-case approach allowing the bankruptcy court, as the trial court, to receive and consider all admissible evidence presented, the demeanor and credibility of the witnesses, and argument of counsel, and make its determination as to whether the creditor has met its burden.").

is the payment of debts by Loss Mitigation outlined above. The other major factor is the nature of the dispute between Vargas and Pogue. Stripped to its essence, this case is a two-party dispute between Pogue and Vargas (and their wholly owned corporations) over either what Pogue should be paid, the future of Loss Mitigation, or both. The original petitioning creditors are all effectively controlled by Pogue: Loss Recovery is under his total control, and Payne/Aleetco does not even know what his claim is, except to the extent that Pogue provides information to him. The additional petitioning creditors are minimal in amount. This case was filed because Pogue wanted it filed.

The Court believes that Pogue's pre-filing conduct was undertaken with the primary goal of regaining control of the business. Virtually all of the settlement offers made by Pogue were directed to this end. In many ways, Pogue was successful; most of the assets of Loss Mitigation were placed within his custody. While the Court is not in a position to determine the exact thinking of Pogue in filing this case, one thing is clear. The entry of an order for relief under Chapter 7 of the Bankruptcy Code would remove Vargas from any control of the assets of Loss Mitigation, including any claim which Loss Mitigation would have against Pogue and/or Loss Recovery. In the experience of the Court, a bankruptcy trustee is more likely to be selling assets on a liquidation, rather than a going concern, basis. Perhaps Pogue saw the filing of a Chapter 7 case as an easier path to his ultimate goal.

The evidence before the Court does not demonstrate that the filing of a Chapter 7 case is in the best interests of creditors.

While Pogue intimated that Loss Mitigation and Vargas had fraudulently transferred assets, no evidence of such transfers was shown, beyond Pogue's testimony that such transfers took place. Vargas admitted that some items had been sold, but stated that such sales were minimal and were made as part of a restructuring of the business of Loss Mitigation. The Court is unconvinced that the appointment of a Chapter 7 Trustee would lead to the recovery of significant assets in this case. The odds of a bankruptcy trustee commencing litigation on the basis identified by Pogue are extremely slim. The only real effect of an involuntary bankruptcy would be to wrest control of Loss Mitigation away from Vargas.

This case is in reality a two-party dispute between Pogue and Vargas. In the *Harmsen* opinion, the Bankruptcy Appellate Panel for the Tenth Circuit noted in a footnote that where a voluntary petition could be dismissed on the basis of a lack of good faith were the debtor to seek resolution of a two-party dispute in bankruptcy court, an involuntary case should be dismissed where similar motivation is found on the part of the petitioning creditors.[93] This Court has not hesitated to dismiss a bankruptcy brought voluntarily by a debtor where the case represents a two-party dispute.[94] What is good for the goose is good for the gander. If a debtor may not seek to resolve its two-party dispute under the auspices of the bankruptcy court, there is no reason to allow a creditor to bring its two-party claim to the same court through the filing of an involuntary petition.

*Abstention Under § 305*

 Under § 305(a)(1) of the Bankruptcy Code,

93. *In re Harmsen,* 320 B.R. at 201, n. 36.

94. *See In re Nichols,* 223 B.R. 353 (Bankr. N.D.Okla.1998); *see also In re Muskogee*

*Envtl. Conservation Co.,* 236 B.R. 57 (Bankr. N.D.Okla.1999).

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if-

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension[.] [95]

The section is equally applicable in voluntary and involuntary cases.[96] Moreover, the issue of abstention under § 305 can be raised by the Court upon its own motion.[97] The Court is not required to hold a separate hearing on the issue of abstention if the Court has conducted a hearing which allowed for the garnering of facts necessary to support the decision to abstain.[98]

■ It is well established that the use of an involuntary bankruptcy filing is an improper method of resolving a two-party dispute.[99] On a broader basis, although the decision to abstain under § 305 is to be made on a case by case basis, certain factors to be considered include:

(1) the motivation of the parties in seeking bankruptcy jurisdiction;

(2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3) the economy and efficiency of administration; and

(4) the prejudice to the parties.[100]

The ultimate decision regarding abstention is left to the discretion of the bankruptcy court.[101]

■ Each of the factors identified above warrant abstention in the present case. This is a two-party dispute between Pogue and Vargas. Certainly there has not been an uprising of creditor support for his position. None of the other petitioning creditors even saw fit to attend the hearing on the merits of the involuntary petition. Given the relationship between Pogue and Payne, it is not surprising that Payne did not expend the effort to appear at trial; his involvement in this case appears to have been at the direction of Pogue. Given the relatively meager amount of the claims of Yale Uniform, Quantum Forms, and Holder, one would not expect them to invest much time or money in this endeavor. To the extent there is a dispute between Pogue and Vargas, the state court stands ready to serve as their forum. There is no efficiency of administration to be served by a Chapter 7

95. § 305(a)(1).

96. In re Colonial Ford, Inc., 24 B.R. 1014, 1020 (Bankr.D.Utah 1982).

97. § 105(a); see In re Duratech Indus., Inc., 241 B.R. 283, 286–87 (E.D.N.Y.1999); Steinman v. Spencer (In re Argus Group 1700, Inc.), 206 B.R. 737, 752 (Bankr.E.D.Pa.1996); Del Webb Commercial Props. Corp. v. Churchill Dev. Ltd. (In re Churchill Dev. Ltd.), 74 B.R. 187, 190 (Bankr.D.Ariz.1987); In re Harvey Probber, Inc., 44 B.R. 647, 652–53 (Bankr. D.Mass.1984); In re Tarletz, 27 B.R. 787, 793 n. 1 (Bankr.D.Colo.1983); In re Coram Graphic Arts, 11 B.R. 641, 645–46 (Bankr.E.D.N.Y. 1981).

98. Hurley v. Kujawa (In re Kujawa), 224 B.R. 104, 107–08 (E.D.Mo.1998).

99. See In re Kass, 114 B.R. 308, 309 (Bankr. S.D.Fla.1990) (and cases cited therein); In re Jr. Food Mart of Ark., Inc., 241 B.R. 423, 426 (Bankr.E.D.Ark.1999) (and cases cited therein). See also In re Silver Spring Center, 177 B.R. 759 (Bankr.D.R.I.1995) (dismissing "a classic two party dispute" under § 305(a)); In re Mazzocone, 200 B.R. 568, 576 (E.D.Pa. 1996) (same).

100. In re Spade, 258 B.R. 221, 231 (Bankr. D.Colo.2001) (citations omitted).

101. Id.; In re Duratech Indus., Inc., 241 B.R. at 287; In re Argus Group 1700, Inc., 206 B.R. at 755 ("As with § 1112(b), the decision whether to dismiss under § 305(a) is discretionary and must be made on a case-by-case basis.").

bankruptcy case. The entry of an order for relief would merely shellac this case with another layer of administrative effort and expense. Neither party can demonstrate prejudice if they are forced to litigate their dispute in a state court of competent jurisdiction; indeed, that is what Loss Mitigation and Vargas seek. The Court believes that, even if Pogue had carried his burden under § 303, dismissal of this case would be appropriate under § 305.

*Damages, Fees, and Costs*

[29, 30] Under § 303(i),

> If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment-
>
> > (1) against the petitioners and in favor of the debtor for-
> >
> > > (A) costs; or
> > >
> > > (B) a reasonable attorney's fee; or
> >
> > (2) against any petitioner that filed the petition in bad faith, for-
> >
> > > (A) any damages proximately caused by such filing;
> > >
> > > or
> > >
> > > (B) punitive damages.[102]

It has been held that this "section is permissive, however, leaving the assessment of fees, costs and damages to the exclusive discretion of the court."[103] As one court ably stated,

> Courts have construed and applied § 303(i)(1) as a "fee-shifting" statute, designed to transfer the costs of litigating

the action to the nonmoving party. *See Keiter v. Stracka,* 192 B.R. 150, 160 (S.D.Tex.1996) (citations omitted). When determining whether to award costs and fees, courts examine the totality of the circumstances. *In re Fox,* 171 B.R. 31, 33 (Bankr.E.D.Va.1994). More specifically, courts weigh such factors as the reasonableness of petitioners' actions, petitioners' motives and objectives, and the merits of petitioners' view that filing was appropriate. *See In re K.P. Enter.,* 135 B.R. 174, 177 (Bankr. D.Me.1992). An award of costs and fees does not require a showing of bad faith, but bad faith may be taken into account. *Camelot, Inc. v. Hayden,* 30 B.R. 409, 411 (E.D.Tenn.1983); *In re Atlas Mach. and Iron Works, Inc.,* 190 B.R. 796, 802 (Bankr.E.D.Va.1995).[104]

On the issue of bad faith, the court in *Better Care* held that

> An improper use of the Bankruptcy Code justifying a finding of bad faith will then exist any time a creditor uses an involuntary bankruptcy to obtain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining such a disproportionate · advantage. This is especially true where the petitioning creditor could have obtained that advantage in an alternate forum.[105]

The *Better Care* court goes on to define a difference between "improper purpose" bad faith, which parallels the improper purpose standards of Bankruptcy Rule 9011, and "improper use" bad faith, which

---

102. § 303(i).

103. *In re Silverman,* 230 B.R. 46, 50 (Bankr. D.N.J.1998) (and cases cited therein).

104. *In re Cadillac by DeLorean & DeLorean Cadillac, Inc.,* 265 B.R. 574, 581 (Bankr. N.D.Ohio 2001).

105. *In re Better Care,* 97 B.R. 405, 411 (Bankr.N.D.Ill.1989) (citation omitted).

looks at the subjective reason for the action taken.[106]

■ There is certainly strong reason to believe that the petitioners herein would fail the improper purpose test for finding bad faith. All of these creditors have adequate remedies at state law. Given the relatively small claims of Yale Uniform, Quantum Forms, and Holder, their resort to the halls of bankruptcy is inexplicable. The odds of a creditor holding a claim in an amount such as they hold realizing any manner of significant recovery through the Chapter 7 process are extremely small. The trial depositions given by representatives of these creditors shed no light upon their motives, which is not surprising, given the timing of the depositions.[107]

Similar questions exist with respect to the subjective motives of the original petitioning creditors. A strong argument could be made that Pogue filed the involuntary in order to coerce a settlement, destroy Loss Mitigation, and/or put himself in the position where he could buy the assets of the business from a bankruptcy trustee at a discount and restart the business. The argument that Pogue intended to act for the benefit of all of the creditors with the purpose of stopping any further transfer of estate property is not borne out by the evidence. At the time of the involuntary filing, Pogue had control of most of the assets of Loss Mitigation. Moreover, Pogue made the threat of involuntary bankruptcy long before he made the accusation that Vargas and Loss Mitigation were dissipating assets. The filing of the involuntary as a tactic to coerce settlement is consistent with Pogue's other tactics, such as contacting BOK, a lender with which Pogue had no business relationship, contacting Sundance regarding the sale of the equipment, and arriving at the business premises of Loss Mitigation with uniformed police officers. It would not be difficult for the Court to find that Pogue filed the involuntary bankruptcy for an entirely improper purpose.

Having said all of this, the Court chooses not to reach the issue of the petitioners' bad faith.[108] Instead, the Court will limit its award to Loss Mitigation to an award of its attorneys' fees and costs incurred in connection with its defense of the involuntary petition. The award will be made jointly and severally against all of the petitioning creditors. Such an award does not require a finding of bad faith.[109] The Court will leave the matter of further damages to whatever court is chosen to deal with the dispute between the parties.

The Court is taking this action for several reasons. It believes that the attorneys' fees incurred in this case by Loss Mitigation are substantial, and are likely to have a sufficient deterrent effect upon the petitioning creditors and others who consider taking similar action in future cases. The

106. *Id.* at 411–12.

107. The Court notes that the trial depositions of representatives for Yale Uniform, Quantum Forms, and Holder were taken on April 19, 2005. As of that date, none of these creditors had joined in the involuntary petition. The joinders were filed on April 22, 2005. *See Docket Nos. 8, 9, & 10.* Each joinder was filed by counsel for Pogue and Loss Recovery.

108. Let there be no misunderstanding. This ruling should not be construed as a finding that the petitioning creditors acted in good faith, or that this judgment has any manner of preclusive effect on that issue. A finding of bad faith is not necessary to support the award of attorneys' fees and costs. Since the Court need not reach the issue, it will not reach the issue. Should another court deem consideration of the issue appropriate, the door remains open.

109. *Lubow Mach. Co. v. Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods. Corp.),* 209 F.3d 100, 105 (2d Cir.2000).

Court is not persuaded that the economic analysis supplied by Vargas is an accurate statement of the damages which Loss Mitigation has suffered as a result of the involuntary filing. Finally, throughout the trial of this matter, Loss Mitigation has asked the Court to let it go to state court to litigate its claims against Pogue. That wish is granted. Loss Mitigation and Vargas are now free to litigate all of their claims against all of the petitioning creditors in state court. That court can consider all of those claims upon a fully developed record, and award Loss Mitigation and/or Vargas whatever damages it sees fit.

■■■ The Court is aware that the award of attorneys' fees and expenses against all of the petitioning creditors jointly and severally may seem harsh with respect to Yale Uniform, Quantum Forms, and Holder given the small amount of their claims. However, as petitioning creditors, they sought the same relief and are bound by the same standards as those creditors which originally filed the petition.[110] The fact that their claims were small does not free them from the constraints imposed by § 303(i). The Court assumes that their counsel advised them of these potential consequences. As the old saying goes, in for a penny, in for a pound.[111]

## Conclusion

This involuntary bankruptcy case is dismissed, with the Court retaining jurisdiction to consider the issue of fees and expenses to be awarded to Loss Mitigation. Loss Mitigation is hereby instructed to submit a fee application in line with *In re Reconversion Technologies, Inc.*,[112] within 15 days of the date of this Order documenting the time spent and fees sought. If no such application is filed, the Court will treat the right to an award of fees and expenses as waived. If an application for fees is timely filed, the petitioning creditors will have 15 days thereafter to file any objections to the fees sought. If the petitioning creditors fail to timely file an objection to the fees sought, the Court will award fees and expenses in the amount sought. If both an application and objection are timely filed, the Court will proceed accordingly, and set the matter for further hearing if necessary.

A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

## JUDGMENT

This matter comes before the Court pursuant to the involuntary petition in bankruptcy filed against ELRS Loss Mitigation, LLC ("Loss Mitigation"). The issues having been duly considered and a decision having been duly rendered, for the reasons set forth in the Memorandum Opinion filed concurrently herewith,

IT IS HEREBY ORDERED that the involuntary petition in bankruptcy filed against ELRS Loss Mitigation, LLC be, and the same hereby is, dismissed with the Court retaining jurisdiction to consider the

---

110. *See In re Kidwell,* 158 B.R. 203 (Bankr. E.D.Cal.1993) ("If an involuntary petition is dismissed other than on the consent of the debtor and all petitioners, the petitioners may be required to pay the debtor's costs and attorney's fees. 11 U.S.C. § 303(i)(1). All petitioners, even those who have joined under section 303(c), are vulnerable to this remedy that arises upon dismissal of the case.").

111. Or as another court so eloquently stated, "one who swats at the hornet had best kill it." *Id.* at 213.

112. 216 B.R. 46 (Bankr.N.D.Okla.1997).

issue of fees and expenses to be awarded to Loss Mitigation.

IT IS FURTHER ORDERED that, pursuant to 11 U.S.C. § 303(i)(1), Loss Mitigation shall be awarded its costs and reasonable attorney's fees incurred in the litigation of this involuntary petition.

IT IS FURTHER ORDERED that said award of fees and expenses shall be made jointly and severally against all of the petitioning creditors in this case, namely Thomas Pogue, Electronic Loss Recovery Services, L.L.C. ("Loss Recovery"), Charles Payne, Yale Uniform, Quantum Forms, and Holders Security.

IT IS FURTHER ORDERED that Loss Mitigation is hereby instructed to submit a statement within 15 days of the date of this Order documenting the time spent and fees sought in the litigation of this involuntary petition.

IT IS FURTHER ORDERED that if no such application is filed, the Court will treat the right to an award of fees and expenses as waived.

IT IS FURTHER ORDERED that if an application for fees is timely filed, the petitioning creditors will have 15 days thereafter to file any objections to the fees and expenses sought.

IT IS FURTHER ORDERED that if the petitioning creditors fail to timely file an objection to the fees sought, the Court will award fees and expenses in the amount sought.

IT IS FURTHER ORDERED that if both an application and objection are timely filed, the Court will proceed accordingly, and set the matter for further hearing if necessary.